**Edward MENNETI, Administrator of the Estate of Marc Albert Warner, Deceased, Appellant,**

v.

**EVANS CONSTRUCTION CO., and William M. Cadman and William Morrow, trading as Morrow's Contracting Company.**

**No. 12590.**

United States Court of Appeals Third Circuit.

Argued June 13, 1958.

Decided Sept. 17, 1958.

Theodore R. Mann, Philadelphia, Pa. (Maximillian J. Klinger, Philadelphia, Pa., on the brief), for appellant.

Joseph Head, Jr., Philadelphia, Pa. (Swartz, Campbell & Henry, Philadelphia, Pa., on the brief), for appellee Morrow's Contracting Co.

Ralph B. D'Orio, Media, Pa. (Hodge, Hodge & Cramp, John F. Cramp, Media, Pa., on the brief), for appellee Evans Const. Co.

Before KALODNER, STALEY and HASTIE, Circuit Judges.

STALEY, Circuit Judge.

This diversity action seeks damages for the death of a minor child who drowned in a ditch dug by defendant Morrow's Contracting Company on the land owned by defendant Evans Construction Company.

The laws of Pennsylvania apply, and the action was brought pursuant to the Pennsylvania Wrongful Death and Survival statutes. 12 Purdon's Pa.Stat.Ann. §§ 1601–1604; 20 Purdon's Pa.Stat. Ann. §§ 320.601, 320.603. The jury verdicts awarded damages to appellant of $385 in the wrongful death cause of action and $45,000 in the survival cause of action. On the post-trial motions of defendant, the district court ordered entry of judgments for the defendants notwithstanding the verdicts and, in the alternative, it granted a new trial on the grounds that the verdicts were against the weight of the evidence and also that the verdict in the survival action was excessive.

There is little dispute about the facts, and all parties agree essentially with the district court's account [1] of them:

"Marc Albert Warner, aged 7, a normal boy of slightly more than average intelligence, was drowned about 5:00 p.m. on May 27, 1953, when he slipped or fell into a rain-filled ditch on the land of Evans Construction Company (Evans), one of the defendants.

"Preparatory to development of this land, which it had owned for less than a year, Evans had had a number of large trees cut down. Thereafter, shortly before May 21, 1953, Evans contracted with the other defendant, Morrow's Contracting Company (Morrow), to have Morrow, an independent contractor, bury the tree stumps near the rear of Evans' tract. Morrow was to use its bulldozer to excavate a ditch into which the stumps were to be pushed and covered with earth.

"Evans' land fronted on Hutchinson Terrace, a rough, unimproved street in Holmes, Delaware County. Hutchinson Terrace was about 2 feet higher than the intended excavation site. The intervening ground of Evans was generally low and uneven, sloping slightly downward toward the proposed ditch site, 132 feet to the east. Lawton Terrace, the next street, was east of and parallel to Hutchinson Terrace and was 225 feet from and about 6 feet higher than the site of the proposed ditch. The ground between Lawton Terrace and the ditch site, most of which was not owned by Evans, sloped moderately downward in a westerly direction and was, in part, overgrown with trees and brush. The surrounding area, though not densely populated, was residential in character. For several years neighborhood children had, from time to time, played upon and traversed Evans' and appurtenant vacant land. Children, including Marc, played upon Evans' land in the afternoon of the first day the work of excavation was in progress.

"Morrow's bulldozer operator, Forrester, began work about 8:30 a.m. on May 21, 1953. On that day he excavated a ditch about 80 feet long, 12 feet wide and 6 feet deep, with an earthen access ramp at one end. He pushed many stumps into the ditch and covered them. However, he was unable to complete the job that day and, when he stopped work about 4:30 p.m., he left, unfilled, a portion of the ditch about 15 to 20 feet long with a maximum depth of 6 feet. When Forrester ceased work in the late afternoon of May 21, intending to resume the work on the following morning, this unfilled section of the ditch was dry.

1. D.C.E.D.Pa.1958, 160 F.Supp. 372.

"The next morning, May 22, it rained. Forrester did not resume the work, as he had intended, because of the rain and his conviction that it would be too muddy for operation of the bulldozer. The amount of that day's rainfall in the vicinity of Holmes is unknown. Measurements, in inches, made at five Philadelphia weather stations, variously located from about 4 to 12 miles from Holmes, varied from .70 to .89.

"Saturday, May 23 and Sunday, May 24, were weekend holidays on which Forrester did not work. It rained early Saturday morning, but clear, sunny weather prevailed on the rest of that day and on Sunday. The quantity of rainfall in Holmes on Saturday morning is not known. Measurements made at the five Philadelphia weather stations showed the following differences in the Saturday morning rainfall: Drexel Institute, .70; International Airport, .13; Point Breeze, .13; Shawmont (Fairmount Park), 1.63; Custom House, .73. International Airport, about 4 miles from Holmes, was the closest of these stations to the ditch site.

"Monday, May 25, dawned clear. Forrester returned to resume the work but found that someone had tampered with the bulldozer which he had parked beside Hutchinson Terrace. He was unable to start the motor and a mechanic was sent from Morrow's shop to assist him. Meanwhile, Forrester concluded that it was too muddy to use the bulldozer in any event and, at the request of Evans, the bulldozer was removed by Morrow's trailer to another Evans' job elsewhere in the county. Later, during that day it rained, and that fall was measured in Philadelphia as follows: Drexel Institute, .17; International Airport, .32; Shawmont, a trace. The amount of rainfall in Holmes is unknown.

"Tuesday, May 26, was a rainy day. The amount of rainfall in Holmes was not ascertainable. All five Philadelphia stations recorded more than 1 inch. Point Breeze station recorded 1.63 and the Custom House station 1.24.

"Wednesday, May 27, was, for the most part, a sunny day, though a slight shower of negligible quantity was noted at the Drexel Institute weather station. Late that afternoon Marc and a young playmate entered upon Evans' land to look for tadpoles. Coming upon the ditch nearly filled with muddy water, they began to float sticks in it. While Marc's playmate was momentarily absent, Marc slipped or fell into the water and was seen by his returning playmate as he disappeared beneath the surface.

"No one saw or examined the ditch after 4:30 p.m. on May 21, nor was anyone aware of the accumulation of water therein, until the arrival of Marc and his playmate in the late afternoon of May 27. The water in the ditch accumulated from the run-off of the heavy rainfall of May 26 upon lands so saturated from the rains, which fell before and on May 25, as to prevent further absorption of water. The maximum depth of the water when Marc fell in was 5 feet 2 inches."

The appellant emphasizes certain additional facts. An employee of Morrow knew that children played on the land where the ditch was excavated. At no time were any precautions taken by either Morrow or Evans to prevent accidents in and around the ditch. There were no guard rails, no signs nor any other form of warning that the ditch was there. Furthermore, although the employee of Morrow was at the site on May 25 and determined that it was too muddy to fill in the ditch, he did not walk over to the ditch to determine its condition and whether there was water in it.

The case was tried on the theory of liability derived from the Restatement of the Law of Torts, § 339 (1934). This was proper inasmuch as § 339 has been adopted by the Supreme Court of Pennsylvania as the law of that state. Dugan v. Pennsylvania Railroad Co., 1956, 387 Pa. 25, 127 A.2d 343, 346; see also Kravetz v. B. Perini & Sons, 3 Cir., 1958, 252

F.2d 905, 907. That section reads as follows:

"A possessor of land is subject to liability for bodily harm to young children trespassing thereon caused by a structure or other artificial condition which he maintains upon the land, if (a) the place where the condition is maintained is one upon which the possessor knows or should know that such children are likely to trespass, and (b) the condition is one of which the possessor knows or should know and which he realizes or should realize as involving an unreasonable risk of death or serious bodily harm to such children, and (c) the children because of their youth do not discover the condition or realize the risk involved in intermeddling in it or in coming within the area made dangerous by it, and (d) the utility to the possessor of maintaining the condition is slight as compared to the risk to young children involved therein."

In its charge the district court left for the consideration of the jury all of the factual questions embraced in § 339, including the question of whether the condition was "maintained" by defendants. Each of the factual issues was resolved in favor of plaintiff and against both defendants.[2]

■ In the post-trial action of entering judgments for defendants notwithstanding the verdicts, the district court concluded that the ditch became filled with water only between 6 and 30 hours before the accident occurred and therefore, as a matter of law, sufficient time did not elapse for a dangerous condition to have been "maintained," as that word is used in § 339. The district court defined "maintain" as "an intentional retention of an artificial condition * * after the possessor had actual or constructive knowledge of its existence." The appellant does not disagree with this definition but urges that the district court erred in deciding that the ditch became a dangerous condition only after it became filled with water. The appellant contends that the dangerous condition was the ditch itself, so situated on low ground that the possessors of the land should have foreseen that it might have filled with water from the spring rains which fell in the days before the drowning. We agree with the position of appellant.

While it is true that it was the water in the ditch which caused the harm, a reasonable man must be considered to have foreseen that the rainfall, a normal phenomenon of nature, would cause this particular ditch to fill with water. The ditch was located in such a spot that it became a catch basin for the drainage from the surrounding terrain. The jury could very well conclude that a reasonably prudent person should have foreseen the filling of the ditch inasmuch as heavy spring rains are not uncommon in eastern Pennsylvania.

It is apparent that the dangerous condition was created at the end of the first day of the work done by Morrow. That being so, it becomes obvious that a sufficient length of time elapsed between the two crucial events—the creation of the condition and the drowning—to make it a jury question whether the condition was "maintained."

■ The appellees argue that appellant's minor decedent must be taken to have realized the hazard involved in the ditch filled with water. The same argument was recently rejected by the Pennsylvania Supreme Court in the case of Cooper v. City of Reading, 392 Pa. 452, 140 A.2d 792, 797 (decided May 2, 1958). There the city discharged its storm drainage water into the bed of a former canal, causing a pool to form at the outlet pipe. The pool was a favorite spot for children at play and was never fenced. On a cold winter day, two minor children were drowned when the ice of the pool on which they were playing

2. The jury's verdicts in the light of the trial court's charge indicate that the jury decided that both Morrow and Evans were possessors of the land involved.

broke beneath their weight. The Supreme Court of Pennsylvania reversed the trial court's entry of judgment for the city notwithstanding the verdicts, and reaffirmed its reliance on § 339 of the Restatement of the Law of Torts. The court said that the pool created an unreasonable risk of harm to child trespassers by the "very fact that the pool was deceptively shallow at its edges and therefore innocent in appearance." In the present case, there was evidence that the water in the ditch was muddy so that its depth was deceptive, especially to children accustomed to playing in the shallow pools which existed on the tract. Furthermore, the ditch was at the low point of slightly higher surrounding lands; it was at a place where a shallow pool of water would naturally gather. In addition, the jury could have found that the gradually sloping ramp leading into the ditch would tend to give to the pool a deceptive appearance of shallowness.

It is our conclusion that the district court erred in setting aside the verdicts for plaintiff and entering judgments for defendants.

The district court took the further action of granting in the alternative a new trial, concluding that the verdicts were against the weight of the evidence and that the verdict in the survival action was excessive. Following the decision of the Supreme Court in Montgomery Ward & Co. v. Duncan, 1940, 311 U.S. 243, 61 S.Ct. 189, 85 L.Ed. 147, our only recourse is to remand for a new trial. The Court there said, 311 U.S. at page 254, 61 S.Ct. at page 196:

> "Should the trial judge enter judgment n. o. v. and, in the alternative, grant a new trial on any of the grounds assigned therefor, his disposition of the motion for a new trial would not ordinarily be reviewable, and only his action in entering judgment would be ground of appeal. If the judgment were reversed, the case, on remand, would be governed by the trial judge's award of a new trial."

The order of the district court granting judgments notwithstanding the verdicts will be reversed and the cause will be remanded for further proceedings in accordance with this opinion.