**Dan LIND, Appellant,**

v.

**SCHENLEY INDUSTRIES INC.**

**No. 12880.**

United States Court of Appeals Third Circuit.

Argued Oct. 6, 1959.

Reargued March 8, 1960.

Decided April 6, 1960.

Bernard Kramer, Newark, N. J., for appellant.

John Milton, Jr., Jersey City, N. J. (Milton, McNulty & Augelli, Jersey City, N. J., Milton B. Seasonwein, John J. Hanlon, Jr., New York City, on the brief), for appellee.

Before BIGGS, Chief Judge, and GOODRICH, McLAUGHLIN, KALODNER, STALEY, HASTIE and FORMAN, Circuit Judges.

BIGGS, Chief Judge.

This is a diversity case. Lind, the plaintiff-appellant, sued Park & Tilford Distiller's Corp.,[1] the defendant-appellee, for compensation that he asserts is due him by virtue of a contract expressed by a written memorandum supplemented by oral conversations as set out hereinafter. Lind also sued for certain expenses he incurred when moving from New Jersey to New York when his position as New Jersey State Manager of Park & Tilford terminated on January 31, 1957. The evidence, including Lind's own testimony, taking the inferences most favorable to Lind, shows the following. Lind had been employed for some years by Park & Tilford. In July 1950, Lind was informed by Herrfeldt, then Park & Tilford's vice-president and general sales-manager, that he would be appointed assistant to Kaufman, Park & Tilford's sales-manager for metropolitan New York. Herrfeldt told Lind to see Kaufman to ascertain what his new duties and

his salary would be. Lind embarked on his new duties with Kaufman and was informed in October 1950, that some "raises" had come through and that Lind should get official word from his "boss", Kaufman. Subsequently, Lind received a communication, dated April 19, 1951, signed by Kaufman, informing Lind that he would assume the title of "District Manager". The letter went on to state: "I wish to inform you of the fact that you have as much responsibility as a State Manager and that you should consider yourself to be of the same status." The letter concluded with the statement: "An incentive plan is being worked out so that you will not only be responsible for increased sales in your district, but will benefit substantially in a monetary way." The other two district managers under Kaufman received similar memoranda. Lind assumed his duties as district sales manager for metropolitan New York. During the weeks following Lind's new appointment, Lind inquired of Kaufman frequently what his remuneration would be under the incentive plan referred to in the letter of April 19, 1951, and was informed that details were being worked out. In July 1951, Kaufman informed Lind that he was to receive 1% commission on the gross sales of the men under him. This was an oral communication and was completely corroborated by Mrs. Kennan, Kaufman's former secretary, who was present. On subsequent occasions Lind was assured by Kaufman that he would get his money. Lind was also informed by Herrfeldt in the autumn of 1952 that he would get a 1% commission on the sales of the men under him. Early in 1955, Lind negotiated with Brown, then president of Park & Tilford, for the sale of Park & Tilford's New Jersey Wholesale House, and Brown agreed to apply the money owed to Lind by reason of the 1% commission against the value of the goodwill of the Wholesale House. The proposed sale of

1. Park & Tilford Distiller's Corp. was merged into Schenley Industries, Inc., a Delaware corporation, before the commencement of this action, with Schenley assuming all of Park & Tilford's obligations. Schenley was substituted in this action on March 31, 1958, by order of Judge Wortendyke.

the New Jersey Wholesale House was not consummated.

Notice to produce various records of Lind's employment was served on Park & Tilford but one slip dealing with Lind's appointment as district manager was not produced and is presumed to have been lost. The evidence was conflicting as to the character of the "incentive compensation" to be offered Lind in connection with his services as a district manager. Herrfeldt designated the incentive an "added incentive plan with a percentage arrangement". Kaufman characterized the plan as "bonuses and contests". Weiner, Park & Tilford's Secretary, said that the incentive was a "pension plan." Kaufman testified, however, that the pension plan had nothing to do with the bonus incentive he referred to.

The record also shows that Lind commenced his employment with Park & Tilford in 1941, that from 1942 to 1950 he worked on a commission basis, that on August 31, 1950, he became an assistant sales manager for the New York metropolitan area at $125 a week, which was raised to $150 a week on October 1, 1950, plus certain allowances. After Lind became district manager on April 19, 1951, he continued to receive the same salary of $150 a week but this was increased to $175 in January 1952. On February 1, 1952, Lind was transferred from New York to New Jersey to become state manager of Park & Tilford's business in New Jersey. He retained that position until January 31, 1957, when he was transferred back to New York.

Park & Tilford moved for but was denied a directed verdict at the close of all the evidence under Rule 50, Fed.R.Civ. Proc., 28 U.S.C. However, the court below invoked Rule 50(b)[2] and submitted the case to the jury subject to a later determination of the legal questions raised by Park & Tilford's motion to dismiss. The court then requested the jury to answer the following five questions: "1. Did Kaufman offer plaintiff one percent of gross sales effected by the salesmen under plaintiff?" "2. If the answer to question 1 is yes, when was plaintiff to commence such commissions?" "3. If the answer to question 1 is yes, when was the commission arrangement to terminate?" "4. Did defendant cause the plaintiff to believe that Kaufman had authority to make the offer to plaintiff referred to in question 1?" "5. Was plaintiff justified in presuming that Kaufman had the authority to make the offer?"

The answers provided by the jury amounted to a determination that Kaufman did offer Lind a 1% commission on the gross sales of the men under him; that the agreement commenced April 19, 1951; that the agreement terminated February 15, 1952, the date of Lind's transfer to New Jersey; that Park & Tilford did cause Lind to believe that Kaufman had authority to offer him the one percent commission; and that Lind was justified in assuming that Kaufman had the authority to make the offer. In addition, the jury awarded Lind $353 as reimbursement for moving expenses in-

2. Rule 50(b) provides as follows: "Whenever a motion for a directed verdict made at the close of all the evidence is denied or for any reason is not granted, the court is deemed to have submitted the action to the jury subject to a later determination of the legal questions raised by the motion. Within 10 days after the reception of a verdict, a party who has moved for a directed verdict may move to have the verdict and any judgment entered thereon set aside and to have judgment entered in accordance with his motion for a directed verdict; or if a verdict was not returned such party, within 10 days after the jury has been discharged, may move for judgment in accordance with his motion for a directed verdict. A motion for a new trial may be joined with this motion, or a new trial may be prayed for in the alternative. If a verdict was returned the court may allow the judgment to stand or may reopen the judgment and either order a new trial or direct the entry of judgment as if the requested verdict had been directed. If no verdict was returned the court may direct the entry of judgment as if the requested verdict had been directed or may order a new trial."

curred by him at the termination of his position as New Jersey State Manager.

The jury did not give a dollar award for the commission deemed owing but the court "molded" the verdict in accordance with the jury's findings and judgment was rendered in favor of Lind against Schenley for $36,953.10 plus interest for the commission and $353.00 for the moving expenses. However, the judgment was nullified by the court's decision to enter a verdict for the defendant under Rule 50(b) in accordance with Schenley's first motion. The court, also under Rule 50(b), granted a new trial in the event that the judgment in favor of the defendant was subsequently reversed. See D.C. N.J.1958, 167 F.Supp. 590.

### The Judgment for Defendant

The decision to reverse the verdict for Lind with respect to the 1% commission was based on two alternative grounds. First, the court found that Lind had failed to prove a case of apparent authority in that the evidence did not disclose that Park & Tilford acted in such a manner as to induce Lind to believe that Kaufman had been authorized to offer him the 1% commission. Also the court concluded that the issues of "actual" and "implied" authority had somehow been eliminated from the case. Second, the court reasoned, that even if the jury could find apparent authority, the alleged contract was not sufficiently definite nor specific to be enforceable against Park & Tilford. The trial judge rejected a contention by Park & Tilford that a document signed by Lind on January 31, 1957, upon receiving his last pay check as New Jersey State Manager, should be construed as a release of his claims for commissions.

A federal court sitting in a diversity case must apply the same law as would a court of the state in which the district court is located. Erie R. Co. v. Tompkins, 1938, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188. We therefore must look initially to New Jersey law. But the contract at bar was made and was to be performed in New York and since we must apply the New Jersey doctrines of conflicts of law, Klaxon Co. v. Stentor Elec. Mfg. Co., 1941, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477, the substantive law of contracts and agency applicable here will be that of New York. James H. Rhodes & Co. v. Chausovsky, 1948, 137 N.J.L. 459, 60 A.2d 623; Polyckronos v. Polyckronos, 1939, 17 N.J.Misc. 265, 8 A.2d 265.

The principle of Erie R. Co. v. Tompkins does not determine the division of functions between court and jury. This is controlled solely by Federal law. Ettelson v. Metropolitan Life Ins. Co., 3 Cir., 137 F.2d 62, certiorari denied 1943, 320 U.S. 777, 64 S.Ct. 92, 88 L.Ed. 467; Diederich v. American News Co., 10 Cir., 1942, 128 F.2d 144. Federal law provides that the answers to questions relating to the scope and extent of an agent's apparent authority are for the triers of the facts, here the jury. See Gilmore v. Royal Indemnity Co., 5 Cir., 1956, 240 F.2d 101. Parenthetically, it may be noted that the New York rule on this point is identical. Hedeman v. Fairbanks, Morse & Co., 1941, 286 N.Y. 240, 36 N.E.2d 129. The jury clearly found that Kaufman had apparent agency power to offer Lind the 1% commission and this verdict may be reversed only if there is no substantial evidence which could support the verdict. Snead v. New York Cent. R. Co., 4 Cir., 1954, 216 F.2d 169; Stanford v. Pennsylvania R. Co., 7 Cir., 1948, 171 F.2d 632.

The problems of "authority" are probably the most difficult in that segment of law loosely termed, "Agency". Two main classifications of authority are generally recognized, "actual authority", and "apparent authority". The term "implied authority" is often seen but most authorities consider "implied authority" to be merely a sub-group of "actual" authority. Mechem, Agency, §§ 51–60 (4th ed. 1952). An additional kind of authority has been designated by the Restatement, Agency 2d, §§ 8A and 161(b) as "inherent agency". Actually this new term is employed to designate a meaning frequently ascribed to "implied authority."

"Actual authority" means, as the words connote, authority that the principal, expressly or implicitly, gave the agent. "Apparent authority" arises when a principal acts in such a manner as to convey the impression to a third party that an agent has certain powers which he may or may not actually possess. "Implied authority" has been variously defined. It has been held to be actual authority given implicitly by a principal to his agent. Another definition of "implied authority" is that it is a kind of authority arising solely from the designation by the principal of a kind of agent who ordinarily possesses certain powers. It is this concept that is called "inherent authority" by the Restatement. In many cases the same facts will support a finding of "inherent" or "apparent agency". Usually it is not necessary for a third party attempting to hold a principal to specify which type of authority he relies upon, general proof of agency being sufficient. Pacific Mut. Life Ins. Co. of California v. Barton, 5 Cir., 1931, 50 F.2d 362, certiorari denied 1931, 284 U.S. 647, 52 S.Ct. 29, 76 L.Ed. 550.

In the case at bar Lind attempted to prove all three kinds of agency; actual, apparent, and inherent, although most of his evidence was directed to proof of "inherent" or "apparent" authority. From the evidence it is clear that Park & Tilford can be held accountable for Kaufman's action on the principle of "inherent authority". Kaufman was Lind's direct superior, and was the man to transfer communications from the upper executives to the lower. Moreover, there was testimony tending to prove that Herrfeldt, the vice-president in charge of sales, had told Lind to see Kaufman for information about his salary and that Herrfeldt himself had confirmed the 1% commission arrangement. Thus Kaufman, so far as Lind was concerned, was the spokesman for the company.

It is not necessary to determine the status of the New York law in respect to "inherent agency" for substantially the same testimony that would establish "inherent" agency under the circumstances at bar proves conventional "apparent" agency. The Restatement, Agency 2d § 8, defines "apparent agency" as "the power to affect the legal relations of another person by transactions with third persons, professedly as agent for the other, arising from and in accordance with the other's manifestations to such third persons." There is some uncertainty as to whether or not the third person must change his position in reliance upon these manifestations of authority, but this is of no consequence in the case at bar since Lind clearly changed his position when he accepted the job of district manager with its admittedly increased responsibilities. There is no doubt that New York accepts the "apparent authority" doctrine if change of position is shown. In Wen Kroy Realty Co. v. Public Nat. Bank & Trust Co., 1932, 260 N.Y. 84, 183 N.E. 73, 75, one of the cases most frequently cited in the New York courts on this subject, Judge Lehman in the course of an opinion in which he did not find apparent authority from the facts of the case before him, held nonetheless that: "[T]he principal is often bound by the act of his agent in excess or abuse of his actual authority, but this is only true between the principal and third person, who believing and having a right to believe that the agent was acting within and not exceeding his authority, would sustain loss if the act was not considered that of the principal." Further support for this position is found in Aneless Corporation v. Woodward, 1933, 262 N.Y. 326, 186 N.E. 800; Sam R. Levy Fabrics, Inc. v. Shapiro Bros. Factors Corp., 1940, 259 App.Div. 463, 19 N.Y.S.2d 593, 595; Harvey v. J. P. Morgan & Co., 1937, 166 Misc. 455, 2 N.Y.S.2d 520, reversed on other grounds, Sup.App.T.1938, 25 N.Y.S.2d 636; 1940, 260 App.Div. 873, 23 N.Y.S. 2d 844.

The opinion of the court below and the argument of the appellee here rely heavily on Gumpert v. Bon Ami Corporation, 2 Cir., 1958, 251 F.2d 735, a diversity case decided under New York law, up-

holding the lower court's reversal of a jury verdict for the plaintiff. The facts in that case showed that Gumpert had been hired by Rosenberg, a director and member of the executive board of the Bon Ami company for a salary of $25,000 in cash plus $25,000 worth of the company's common stock. The Court of Appeals found that the jury could not properly find that the Bon Ami company had clothed Rosenberg with apparent authority to offer Gumpert $25,000 in common stock. This decision is inapposite for here we deal with an offer made by an employee's immediate superior, the man who represented the company to those under him, not a contract offered by one not an officer of a corporation to prospective employee. Furthermore a salary of $25,000 in cash and $25,000 in common stock might well be deemed unusual enough to put the prospective employee on notice as to a possible lack of authority in the director to make the offer but the same may not be said of an offer of a commission to a salesman who had been habitually working on that basis, in a corporation that confined itself to selling others' products. It should be borne in mind also that a director, even if he be a member of the executive board, does not ordinarily hire employees. Moreover in the case at bar there was evidence by an employee of Schenley that at least some state managers received 1% commissions.

Testimony was adduced by Schenley tending to prove that Kaufman had no authority to set salaries, that power being exercisable solely by the president of the corporation, and that the president had not authorized Kaufman to offer Lind a commission of the kind under consideration here. However, this testimony, even if fully accepted, would only prove lack of actual or implied authority in Kaufman but is irrelevant to the issue of apparent authority.

■ The opinion below seems to agree with the conception of the New York agency law as set out above but the court reversed the jury's verdict and the judgment based on it on the conclusion,

as a matter of law, that Lind could not reasonably have believed that Kaufman was authorized to offer him a commission that would, in the trial judge's words "have almost quadrupled Lind's then salary". But Lind testified that before he had become Kaufman's assistant in September 1950, the latter position named being that which he had held before being "promoted" to district manager in April 1951, he had earned $9,000 for the period from January 1, 1950 to August 31, 1950, that figure allegedly representing half of his expected earnings for the year. Lind testified that a liquor salesman can expect to make 50% of his salary in the last four months of the year owing to holiday sales. Thus Lind's salary two years before his appointment as district manager could have been estimated by the jury at $18,000 per year, and his alleged earnings, as district manager, a position of greater responsibility, do not appear disproportionate. On the basis of the foregoing it appears that there was sufficient evidence to authorize a jury finding that Park & Tilford had given Kaufman apparent authority to offer Lind 1% commission of gross sales of the salesmen under him and that Lind reasonably had relied upon Kaufman's offer.

■ The second ground for setting aside the jury verdict was that the alleged contract was too indefinite and uncertain to be enforced against the defendant because no date of commencement or termination of the contract had been shown. Employment contracts often breed litigation because they frequently are informal, brief, and indefinite even when accompanied by correspondence. This is particularly so when dealing with a promotion within a relatively small office. However, as Corbin states, it has always been the law that "if the parties have concluded a transaction in which it appears that they intend to make a contract, the court should not frustrate their intention if it is possible to reach a fair and just result, even though this requires a choice among conflicting meanings and the filling of some gaps

that the parties have left."[3] Williston adds that in contracts of service when no time of employment is fixed by the express terms of the contract, the apparent intention of the parties must be sought as a question of fact.[4] In the case at bar the jury made reasonable findings that the contract commenced on April 19, 1951, the date of the letter appointing Lind to his new position, and that the date of termination was February 15, 1952. This latter finding led the court to conclude that the jury's determination on this point was not proper since undisputed testimony indicated that Lind was appointed New Jersey State Manager effective February 1, 1952. However, as Lind points out, the pay records and payslips[5] introduced by the defendant both carry Lind in the status of New York manager up to February 15, 1952. The jury was entitled to find that although Lind assumed a new position on February 1, 1952, his new pay status did not commence until February 15.

We conclude that the contract alleged was sufficiently definite and certain to be sustainable and that there was ample evidence of extrinsic circumstances to permit the jury to fix the relevant dates for Lind's compensation as it did. It must be noted also that this is a case in which a plaintiff is suing for payment for a completed performance and it would be unjust to deny compensation on the ground of uncertainty of terms of employment if the facts afford a reasonable basis for filling in contractual lacunae.

An additional argument offered by Park & Tilford in support of the court's judgment is that a document signed by Lind when he terminated his employment with Park & Tilford can be construed as a release of Lind's claim to any further compensation. The opinion below dismissed this claim, holding that the writing was merely a receipt for wages and vacation benefits indisputably owing. We concur with the view of the trial court on this point.

The jury's verdict of $353 for Lind's moving expenses was also reversed because the court could find no proof that the "unnamed assistant" of Herrfeldt, who allegedly promised to reimburse Lind had any "express, implied or apparent authority to thus bind the corporation." An examination of the record indicates that this assistant was identified by Lind as John Niven, an "Administrative Assistant" to Herrfeldt, the corporation's vice-president in charge of sales. Lind further testified that on the occasion of his moving from New York to New Jersey to assume the job of state manager, the company had paid his moving expenses. If the jury believed Lind's testimony, he clearly proved the apparent authority of Niven to bind the company to pay his moving expenses. There was no reason for Lind to doubt the word of an administrative assistant to the vice-president in a matter such as this in the light of his past experience. It must be remembered that when dealing with internal corporate management matters an employee must be able to rely on the word of his superiors, or their apparent spokesmen, lest operation of such organizations become impossible. A salesman cannot check every promise made to him by a superior with the president and the board of directors of the corporation. For the reasons stated we think the court below erred in reversing the jury's verdict in Lind's favor for his moving expenses.

### The Granting of the Motion for New Trial

The district court granted the alternative motion for a new trial because it found the jury's verdict (1) contrary to the weight of the evidence, (2) contrary to law and (3) a result of error in the admission of evidence. Our conclusion that the verdict was not contrary to law automatically eliminates ground (2).

---

3. Corbin, Contracts, Section 95.

4. 1 Williston, Contracts, Section 39.

5. Defendant's Exhibits D–15 and D–103g.

It is convenient to consider the evidentiary issue relating to point (3) first. A tabulated summary which purported to indicate the sales of liquor made during the years 1950 and 1951, compiled by personnel under Lind's supervision was admitted into evidence over the defense's objections on grounds of irrelevancy. It was on the basis of these records that Lind was able to establish the exact amount of the commissions he alleged were due him. The court below, however, in ruling upon the defendant's motion for a new trial declared that it had erred in admitting the documents because they were not made in the regular course of business so as to be admissible under 28 U.S.C. § 1732.[6] It is interesting to note that the defense never objected to these records on this ground. The records were kept by an employee of the defendant under Lind's supervision apparently pursuant to the instruction of the corporation as expressed in the inter-office memorandum dated April 19, 1951 from Kaufman to Lind alluded to above. The memorandum, in addition to notifying Lind of his new position as district manager outlined his future duties and item eight ordered him to maintain "supervision over records and sales figures for your district which will be kept in a central location in the office." It is difficult to see how these records could be termed anything other than "records kept in the regular course of business". The bare fact that the man who supervised the making of the records relies on them is no bar to their admission into evidence under 28 U.S.C.A. § 1732. However, Section 1732 does provide that "all other circumstances of the making of such writing or record, including lack of personal knowledge by the entrant or maker, may be shown to affect its weight, but such circumstances shall not affect its admissibility". These records, then, were properly admitted into evidence and a new trial could not be granted on this ground.

The remaining basis for ordering a new trial is that the verdict was against the weight of the evidence. It is frequently stated that a motion for a new trial on this ground ordinarily is nonreviewable because within the discretion of the trial court. Montgomery Ward & Co. v. Duncan, 1940, 311 U.S. 243, 251, 61 S.Ct. 189, 85 L.Ed. 147; Zegan v. Central R. Co., 3 Cir., 1959, 266 F.2d 101; Menneti v. Evans Construction Co., 3 Cir., 1958, 259 F.2d 367. But this discretion must still be exercised in accordance with ascertainable legal standards and if an appellate court is shown special or unusual circumstances which clearly indicate an abuse of discretion in that the trial court failed to apply correctly the proper standards, reversal is possible. See e. g. Indamer Corporation v. Crandon, 5 Cir., 1954, 217 F.2d 391. Concededly appellate courts rarely find that the trial court abused its discretion.

In Commercial Credit Corp. v. Pepper, 5 Cir., 1951, 187 F.2d 71, 75–76, Judge Borah stated: "It is a principle well recognized in the federal courts that the granting or refusing of a new trial is a matter resting within the discretion of the trial court. The term 'discretion', however, when invoked as a guide to judicial action, means a sound discretion, exercised with regard to what is right and in the interests of justice. And an appellate court is not bound to stay its hand

---

6. 28 U.S.C.A. § 1732 provides as follows: "(a) In any court of the United States and in any court established by Act of Congress, any writing or record, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any act, transaction, occurrence, or event, shall be admissible as evidence of such act, transaction, occurrence, or event, if made in regular course of any business, and if it was the regular course of such business to make such memorandum or record at the time of such act, transaction, occurrence, or event or within a reasonable time thereafter.

"All other circumstances of the making of such writing or record, including lack of personal knowledge by the entrant or maker, may be shown to affect its weight, but such circumstances shall not affect its admissibility.

"The term 'business,' as used in this section, includes business, profession, occupation, and calling of every kind."

and place its stamp of approval on a case when it feels that injustice may result. Quite to the contrary, it is definitely recognized in numerous decisions that an abuse of discretion is an exception to the rule that the granting or refusing of a new trial is not assignable as error." Thus an appellate court must still rule upon the propriety of an order for a new trial, even though the grounds for reversal are exceedingly narrow. But before any rational decision can be made, the reviewing court must know what standards the trial judge is bound to apply when ruling upon a motion for a new trial. These standards necessarily vary according to the grounds urged in support of the new trial. There is, however, little authority on what standards are to be applied in ruling on a motion for new trial on the grounds that the verdict is against the weight of the evidence beyond the simple maxim that the trial judge has wide discretion. The few available authorities are conflicting. Professor Moore concludes that while the trial judge has a responsibility for the result at least equal to that of the jury he should not set the verdict aside as contrary to the weight of the evidence and order a new trial simply because he would have come to a different conclusion if he were the trier of the facts. Professor Moore states in this connection: "[S]ince the credibility of witnesses is peculiarly for the jury it is an invasion of the jury's province to grant a new trial merely because the evidence was sharply in conflict. The trial judge, exercising a mature judicial discretion, should view the verdict in the overall setting of the trial; consider the character of the evidence and the complexity or simplicity of the legal principles which the jury was bound to apply to the facts, and abstain from interfering with the verdict unless it is quite clear that the jury has reached a seriously erroneous result. The judge's duty is essentially to see that there is no miscarriage of justice. If convinced

that there has been then it is his duty to set the verdict aside; otherwise not." [7]

Professor Moore's views are logical and persuasive and buttressed by some decisional authority. See Werthan Bag Corp. v. Agnew, 6 Cir., 1953, 202 F.2d 119, 122 (question of damages). In the same vein, Schirra v. Delaware, L. & W. R. Co., D.C.M.D.Pa.1952, 103 F.Supp. 812, 820, holds that if "there is an evidentiary basis for the jury's verdict, the jury is free to discard or disbelieve whatever facts are inconsistent with its conclusion, and it is immaterial that the court might draw a contrary inference or feel that another conclusion is more reasonable." Pelham v. Hendricks, D.C. M.D.Pa.1955, 132 F.Supp. 774, 775, goes further, ruling that: "The evidence and inferences reasonably deducible therefrom must be viewed in the light most favorable to the prevailing party, and the Court must assure that the jury followed the Court's instructions."

Miller v. Pacific Mut. Life Ins. Co., D.C.W.D.Mich.1954, 17 F.R.D. 121, 125; American Cooler Co. v. Fay & Scott, D.C. D.Me.1937, 20 F.Supp. 782, 783 and United States v. 13.40 Acres of Land, D.C. N.D.Cal.1944, 56 F.Supp. 535, 538, go farther in restricting the discretion of the trial judge for these authorities hold that the jury's verdict may not be set aside and a new trial ordered merely because the verdict is contrary to the preponderance of the evidence. The first and second of the three cases cited hold that the verdict "must be so manifestly and palpably against the evidence in the case as to compel the conclusion that the verdict is contrary to right and justice". And the third opinion cited states that a new trial may not be ordered unless, "The evidence as a whole, after according to it the highest probative force to which it is lawfully entitled, is insufficient to support the verdict." Judge Yankwich took a similar restricted view of his own discretion in ordering a new trial because the verdict was contrary to the weight of the evidence. In Lyophile-Cryochem

---

**7.** 6 Moore's Federal Practice, 2d Ed., p. 3819.

Corp. v. Cutter Laboratories, Inc., D.C. N.D.Cal.1948, 78 F.Supp. 903, he recognized that a motion for a new trial may be granted if the trial judge is satisfied that the verdict was against the preponderance of the evidence but he took the position that the trial judge should not substitute his judgment on the facts for that of the jury except in extreme circumstances.

But there is also some authority supporting an almost unlimited discretion in the trial judge in granting or denying a motion for a new trial. In Murphy v. United States District Court for Northern District of California, Southern Division, 9 Cir., 1944, 145 F.2d 1018, 1020, the Court of Appeals upheld the granting of a new trial by Judge Goodman in United States v. 13.40 Acres of Land, supra. The appellate court found the trial judge's discretion in such matters was wider than did Judge Goodman himself. The appellate tribunal said that "The granting of a new trial is discretionary with the court and subject to no fixed rule except a consideration of what is just". But the exception stated is itself a potent one. The case of Grayson v. Deal, D.C.N.D.Ala.1949, 85 F.Supp. 431, stands for the proposition that the court may consider the evidence as a whole and weigh it, and if it considers that the jury was mistaken or that its verdict was wrong, although supported by evidence, a new trial should be granted.

What we have stated demonstrates that there is no consensus of opinion as to the exact standards to be used by a trial court in granting a new trial and that the criteria to be employed by an appellate tribunal charged with reviewing the trial judge's decision in this respect are equally indefinite. New trials granted because (1) a jury verdict is against the weight of the evidence may be sharply distinguished from (2) new trials ordered for other reasons: for example, evidence improperly admitted, prejudicial statements by counsel, an improper charge to the jury or newly discovered evidence. In the first instance given it is the jury itself which fails properly to perform the functions confided to it by law. In the latter instances something occurred in the course of the trial which resulted or which may have resulted in the jury receiving a distorted, incorrect, or an incomplete view of the operative facts, or some undesirable element obtruded itself into the proceedings creating a condition whereby the giving of a just verdict was rendered difficult or impossible. In the latter instances, (2), supra, the trial court delivered the jury from a possibly erroneous verdict arising from circumstances over which the jury had no control. Under these conditions there is no usurpation by the court of the prime function of the jury as the trier of the facts and the trial judge necessarily must be allowed wide discretion in granting or refusing a new trial.

[17] But where no undesirable or pernicious element has occurred or been introduced into the trial and the trial judge nonetheless grants a new trial on the ground that the verdict was against the weight of the evidence, the trial judge in negating the jury's verdict has, to some extent at least, substituted his judgment of the facts and the credibility of the witnesses for that of the jury. Such an action effects a denigration of the jury system and to the extent that new trials are granted the judge takes over, if he does not usurp, the prime function of the jury as the trier of the facts. It then becomes the duty of the appellate tribunal to exercise a closer degree of scrutiny and supervision than is the case where a new trial is granted because of some undesirable or pernicious influence obtruding into the trial. Such a close scrutiny is required in order to protect the litigants' right to jury trial.

Where a trial is long and complicated and deals with a subject matter not lying within the ordinary knowledge of jurors a verdict should be scrutinized

more closely by the trial judge than is necessary where the litigation deals with material which is familiar and simple, the evidence relating to ordinary commercial practices. An example of subject matter unfamiliar to a layman would be a case requiring a jury to pass upon the nature of an alleged newly discovered organic compound in an infringement action. See 3 Walker on Patents, Deller's ed., Section 697. A prime example of subject matter lying well within the comprehension of jurors is presented by the circumstances at bar.

■■■■ The subject matter of the litigation before us is simple and easily comprehended by any intelligent layman. The jury's main function was to determine the veracity of the witnesses: i. e. what testimony should be believed. If Lind's testimony and that of Mrs. Kennan, Kaufman's secretary, was deemed credible, Lind presented a convincing, indeed an overwhelming case. We must conclude that the jury did believe this testimony and that the court below substituted its judgment for that of the jury on this issue and thereby abused its legal discretion.

The judgment of the court below will be reversed and the case will be remanded with the direction to the court below to reinstate the verdict and judgment in favor of Lind.

HASTIE, Circuit Judge, with whom KALODNER, Circuit Judge, joins (dissenting).

I agree that the order granting judgment for the defendant notwithstanding the verdict for the plaintiff, must be set aside. However, I think the majority make a serious mistake when they take the extraordinary additional step of reversing the alternative order of the trial judge, granting a new trial because he considered the verdict against the weight of the evidence.

This court has never before reversed an order of a trial judge granting a new trial because of his conclusion on all of the evidence that the jury had reached an unjust result. At least, neither I nor any of my colleagues can find a precedent in our court for such action. Rather, we have recognized that the function in question is broadly discretionary, "requir[ing] that the trial judge evaluate all significant evidence, deciding in the exercise of his own best judgment whether the jury has so disregarded the clear weight of credible evidence that a new trial is necessary to prevent injustice." See Zegan v. Central R. Co. of New Jersey, 3 Cir., 1959, 266 F.2d 101, 104. The opinions of other courts cited by the majority not only recognize that discretion but also emphasize its extreme breadth.

This traditional conception of the role of the trial judge has provided the one important limitation on the power of the jury to make an unimpeachable decision on the facts, even where the evidence is conflicting. The judge may not substitute the verdict he would have rendered on the evidence for that actually rendered by the jury. But he may avoid what in his professionally trained and experienced judgment is an unjust verdict by vacating it and causing the matter to be tried again by a second jury. Thus, the essential institution of jury trial is respected and an expedient middle ground is maintained between the absence of any control over a jury's verdict on conflicting evidence, on the one hand, and judicial usurpation of the fact finding function, on the other.

Under this scheme the only function of a reviewing court, once the trial court has ordered a new trial, is to see whether there can have been any basis in reason for the trial judge's conclusion as to the weight of the evidence and the injustice of the verdict. The majority do not challenge this view, though they do not state explicitly what their understanding of our role is.

The present record discloses a sharp conflict of testimony whether Kaufman,

the metropolitan sales manager, ever promised plaintiff, his subordinate district manager, a 1% commission on all gross sales of agents working under plaintiff. There are several remarkable aspects of this alleged promise which could reasonably have influenced the trial judge on this decisive issue. This commission would have more than quadrupled plaintiff's salary of $150 per week, making him much higher paid than his immediate superior, Kaufman, or any other company executive, except the president. No other sales manager or supervisor received any such commission at all. Moreover, after the alleged promise was made, month after month elapsed with no payment of the 1% commission or indication of any step to fulfill such an obligation. Yet plaintiff himself admits that he made no formal demand for or inquiry about the large obligation for several years, and said nothing even informally about it to anyone for many months save for an occasional passing verbal inquiry said to have been addressed to Kaufman. The trial court may have reasoned that the amount said to have been promised was so abnormally large and plaintiff's concern about nonpayment so unnaturally small as to make it incredible that the promise ever was made. In addition, the very vagueness of the alleged promise and the absence of any mention of time in it may have increased the incredulity of the judge who heard the evidence.

In such circumstances it was neither arbitrary nor an abuse of discretion for the trial judge to grant a new trial. Whether in the same circumstances some other trial judge or any member of this court would have let the verdict stand is beside the point.

The majority think the trial judge usurped the function of the jury. I think it is we who are impinging upon the function and discretion of the trial judge in a way that is serious, regrettable and without precedent in this court.