**KING WORLD PRODUCTIONS, INC. and Camelot Entertainment Sales, Inc., Plaintiffs,**

v.

**FINANCIAL NEWS NETWORK, INC. and Elio Betty, Defendants.**

**No. 85 Civ. 10036 (EW).**

United States District Court, S.D. New York.

May 15, 1987.

Roberts & Moelis, New York City, for plaintiffs; Kenneth G. Roberts, of counsel.

Friedman, Leeds, Shorenstein & Armenakis, New York City, for defendants; Paul H. Appel, of counsel.

## OPINION

EDWARD WEINFELD, District Judge.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiffs, King World Productions, Inc. and its subsidiary, Camelot Entertainment Sales, Inc. (referred to as King World), were prime tenants of the thirty-second floor of 964 Third Avenue in New York City. King World sought to sublease this space for the balance of the unexpired term, some five years. During June and July 1985, it carried on negotiations to sublease the premises with representatives of defendant Financial News Network, Inc. (FNN). Those who acted on behalf of King World were Stephen W. Palley, its General Counsel and Senior Vice President, and

Jonathan Birkhahn, an associate in a law firm representing King World. Those who acted on behalf of FNN included Paul Steinle, its President, Elio Betty, a Senior Vice President, and Peter Casciato, its General Counsel. Through extensive negotiations, mostly carried out by telephone calls between New York and California, and concluded with a face to face meeting in New York City between Birkhahn and Betty, the parties agreed upon the definitive terms of a sublease.

On July 30, 1985, Casciato, then at FNN's office in California, informed Birkhahn that Betty would sign the sublease on behalf of FNN at FNN's office in New York. Betty was instructed to sign the sublease by Steinle. On July 31, Birkhahn presented the sublease to Betty for execution, at which time he informed Betty that FNN would be required to submit financial statements to the landlord to obtain its consent. The sublease as drafted provided that it was to be of no force and effect unless the written consent of the landlord was obtained within 90 days from the date of its execution. Betty interlineated the paragraph requiring such consent, shortening the period to 45 days, and executed the sublease on behalf of FNN, which was countersigned on behalf of King World. The next day, August 1, King World's attorney delivered a copy of the executed sublease to the landlord, AR DE Realty, N.V., and requested its consent.

On August 5, 1985, without prior discussion or notice to King World, Casciato telephoned Birkhahn and stated that Betty lacked authority to sign the sublease. He also asked that King World put the premises back on the market. Thereupon Birkhahn, by letter, confirming his position during their telephone call, notified Casciato that FNN's conduct constituted a breach of the executed sublease, and that King World was putting the premises back on the market in order to mitigate damages. King World also notified AR DE Realty that FNN had repudiated the sublease and it no longer need consider approving the sublease. Thereafter, on November 11, 1985, King World entered into a sublease of the premises with The Perfumer's Workshop, Ltd., to which AR DE Realty consented on December 10, 1985.

King World then commenced this action to recover damages from FNN for breach of the written agreement, and also named Elio Betty as a defendant upon an alternative, separate claim for breach of warranty of authority to act on behalf of FNN. FNN resists liability on two grounds: first, that Betty was without express, implied, or apparent authority to enter into the sublease; and second, that King World has failed to establish that the landlord would have consented to the sublease. Upon consideration of the entire record and an appraisal of the demeanor of the witnesses, the Court finds that plaintiff has sustained its burden of proof on its claims against FNN and is entitled to recovery of damages sustained.

## I. Authority to Enter Into the Sublease

The Court finds, first, that the evidence is sufficient to sustain plaintiff's claim that Betty had actual authority, or at the very least, apparent authority, to execute the sublease. As defined under New York law,[1] actual authority may be either express or implied. Implied authority has been considered to be "actual authority given implicitly by a principal to his agent."[2] The term has also been defined as "a kind of authority arising solely from the designation by the principal of a kind of agent who ordinarily possesses certain powers."[3]

---

**1.** The parties do not dispute that in this diversity action New York's substantive law applies. The subject of the agreement was property located in New York. King World and FNN each maintain offices in New York.

**2.** *Masuda v. Kawasaki Dockyard Co.,* 328 F.2d 662, 664–65 (2d Cir.1964); *Lind v. Schenley Indus., Inc.,* 278 F.2d 79, 84 (3d Cir.), *cert. denied,*

364 U.S. 835, 81 S.Ct. 58, 5 L.Ed.2d 60 (1960); *Songbird Jet Ltd. v. Amax, Inc.,* 581 F.Supp. 912, 919 (S.D.N.Y.1984).

**3.** *Masuda v. Kawasaki Dockyard Co.,* 328 F.2d 662, 664–65 (2d Cir.1964); *Lind v. Schenley Indus., Inc.,* 278 F.2d 79, 85 (3d Cir.), *cert. denied,* 364 U.S. 835, 81 S.Ct. 58, 5 L.Ed.2d 60 (1960);

The general rule in New York with regard to implied authority is that "an agent employed to do an act is deemed authorized to do it in the manner in which business entrusted to him is usually done."[4]

Betty was the third highest executive officer of FNN. Ahead of him were only Earl W. Brian, FNN's Chief Executive Officer and Chairman of the Board of Directors, and Steinle, the President. Betty's employment agreement in effect during July 1985 provided that his "duties [would] be outlined by and under the direction of the President of FNN." Betty's actions in negotiating the sublease were taken upon the specific instructions of Steinle to find new space in the New York area. Steinle also orally instructed Betty to execute the sublease. Steinle testified that he had telephone conversations with both Brian and Betty on the subject of the sublease, that Brian "certainly" was aware that Betty was looking for rental space on behalf of FNN, and that he, Steinle, had delegated authority to Betty to look for the space.

The extent of Betty's authority in the corporate structure may also be gleaned from his other activities. He signed the agreement with the broker that led to the negotiations for the sublease. Moreover, Betty executed over 100 other contracts for FNN without express authorization or ratification by the Board of Directors. The absence of express authorization or ratification of the sublease by the Board in this case was not atypical. The evidence establishes that the lease for the corporate headquarters of FNN located at Santa Monica, California, was signed by an officer, and no authorization or approval by the Board of Directors is contained in the minutes of the corporation.

In an effort to overcome the foregoing substantial evidence of actual authority, both express and implied, Brian testified generally and somewhat vaguely that a company policy required that all contracts for a term exceeding one year or involving a substantial amount of money be approved by the Board of Directors. However, FNN did not produce any bylaw or corporate resolution to this effect, or any minutes reflecting the adoption of this policy by the Board of Directors, despite King World's pretrial request for all documents concerning the authority of FNN's employees to enter into any real property agreements.

The only document reflecting such a policy submitted at trial was a computer-generated excerpt of FNN's "Policies and Practices Manual." This excerpt contains a provision that:

> By order of the Board of Directors, any lease or obligation in excess of $10,000 in amount or in excess of one year duration shall not be executed on behalf of the Corporation by any employee other than the Chairman and Chief Executive Officer or Chief Financial Officer unless specifically authorized by the Board of Directors.

The cover page of the document is dated June 9, 1982, but each page of the printout is dated April 22, 1987. There was no testimony as to whether the document had been updated or modified in any way since 1982. The existence of this document, unsupported by any minutes indicating adoption of the alleged policy by the Board of Directors, is inadequate to refute the evidence of the actual practices of FNN's officers and Board as outlined above. Moreover, were the document deemed to accurately reflect FNN's practices, it would support a finding of actual authority, because it states that Board approval is not needed for contracts executed by FNN's Chief Financial Officer. According to a 10Q filing by FNN, Steinle was not only President of FNN, but served as its Chief Financial Officer from August 1984 to July 1985. It was Steinle who instructed Betty to sign the contract.

■ Thus, notwithstanding the policy manual, upon the totality of the statements, acts, and conduct of FNN's execu-

---

*Songbird Jet Ltd. v. Amax, Inc.,* 581 F.Supp. 912, 919 (S.D.N.Y.1984).

4. *Wen Kroy Realty Co. v. Public Nat'l Bank & Trust Co.,* 260 N.Y. 84, 89–90, 183 N.E. 73 (1932), *quoted in Lind v. Schenley Industries Inc.,* 278 F.2d 79, 85 (3d Cir.1960).

tives with respect to Betty's negotiations with King World representatives and agents, it may fairly be said that Betty was not only expressly authorized to execute the contract, but was also vested with "actual authority implicitly given by the principal to the agent."

■ Even assuming that King World has failed to establish actual authority, the evidence is overwhelming that Betty had apparent authority to execute the sublease. As defined under New York law,

> Apparent authority is the application of the doctrine of estoppel. It arises when a principal places an agent in a position where it appears that the agent has certain powers which he may or may not possess. If a third person holds the reasonable belief that the agent was acting within the scope of his authority and changes his position in reliance on the agent's act, the principal is estopped to deny that the agent's act was not authorized.[5]

So long as a principal's words and conduct make it reasonable to believe that an agent has authority to enter into a transaction, a third party relying on that reasonable belief need not inquire further into actual authority, and the principal will be bound by its agent.[6]

In this case, the evidence justified both Palley and Birkhahn, King World's representatives, in having a reasonable belief that every FNN representative who played a role in the sublease transaction was acting within the scope of his authority. King World was dealing with top executives and counsel of FNN, and FNN is estopped to deny Betty's authority to sign the sublease on its behalf and bind it to the written commitment. As noted, Betty was an Executive Vice President who was third in command at FNN. Moreover, he was the executive in charge of FNN's New York office, and he was referred to as such by Casciato, FNN's General Counsel, in a discussion with a King World representative. Furthermore, during negotiation of the sublease, Casciato brought Betty into a conference call with two King World representatives, introducing Betty as the principal who could resolve the remaining areas of disagreement between the parties. Given Betty's position at FNN nationally, his position within the local office, and his key role during the negotiations, there was nothing to put King World on notice that Betty might not have authority to execute the sublease.

Finally, and of great significance, it was Casciato who directed that King World bring the sublease to Betty for execution. He specifically instructed Birkhahn, King World's representative, to take the sublease to Betty's office, where Betty would execute it. Birkhahn did so, and Betty signed the document. Birkhahn was thus justified in the reasonable belief that Betty was authorized to act on behalf of FNN.

It is also significant that Casciato, a representative of FNN who was substantially involved in the negotiation of the sublease and who arranged for its execution, did not testify as a witness at the trial, and that no explanation was offered for his failure to appear and support FNN's defense of lack of authority. Surely a General Counsel of a corporation may be presumed to be knowledgeable of the scope of authority of the corporation's agents and officers, and ordinarily, the testimony of a General Counsel would be expected to favor the corporation. In this circumstance, given FNN's failure to call Casciato, and given Birkhahn's testimony regarding Casciato's representations as to Betty's authority, the inference is properly drawn that his testi-

---

**5.** *Lind v. Schenley Industries Inc.*, 278 F.2d 79, 85 (3d Cir.1960), *quoted in Masuda v. Kawasaki Dockyard Co.*, 328 F.2d 662, 664–65 (2d Cir. 1964); *Hallock v. State*, 64 N.Y.2d 224, 485 N.Y. S.2d 510, 513, 474 N.E.2d 1178, 1181 (1984);

*Wen Kroy Realty Co. v. Public Nat'l Bank & Trust Co.*, 260 N.Y. 84, 91, 183 N.E. 73 (1932).

**6.** *Hallock v. State*, 64 N.Y.2d 224, 485 N.Y.S.2d 510, 513–14, 474 N.E.2d 1178, 1181–82 (1984); *Benderson Development Co. v. Schwab Bros.*

mony would have been adverse to FNN's contention.[7]

Relying upon Betty's apparent authority, King World delivered the executed sublease to its landlord for approval and took the premises off the market. It was not until Casciato's phone call that King World was informed that FNN would not adhere to the contract. Because King World reasonably relied upon the appearance of Betty's authority, created by the actions of FNN's agents, FNN is estopped to deny liability for Betty's execution of the contract.

## II. Proof that the Sublease Would Be Approved

FNN also seeks to avoid liability on the ground that King World failed to prove that AR DE Realty would have consented to the sublease within 45 days. In making this argument, FNN relies on a series of cases that stand for two propositions: first, that in the event of a defendant's anticipatory breach of a contract, a plaintiff need not perform a futile condition precedent in order to recover on the contract, and second, that plaintiff must nonetheless prove that it was ready, willing, and able to perform its part of the bargain.[8] FNN, focusing on the second principle, claims that

King World failed to establish that it was able to perform because it did not prove that the landlord would have approved the sublease.

■ Imposing such a burden on the plaintiff under the circumstances of this case is not required by precedent and would, in fact, be inequitable. In order to establish that the landlord would have approved the sublease, King World would have had to continue pursuing the landlord's approval even after the landlord had been informed of FNN's repudiation of the contract. This would defy common sense. By insisting that plaintiff prove the landlord would have approved the sublease, FNN essentially asks this Court to deny King World relief because it refused to perform a futile act. This the law does not require.[9]

Whether the landlord would have approved the sublease was rendered inherently speculative by the fact that FNN repudiated the contract before the 45 day period for approval expired. When FNN asserted that Betty lacked authority to bind it, it requested King World to put the premises back on the market. Once FNN repudiated, circumstances relevant to the landlord's

---

*Trucking, Inc.,* 64 A.D.2d 447, 409 N.Y.S.2d 890, 897 (4th Dep't 1978).

7. *Karavos Compania Naviera, S.A. v. Atlantica Export Corp.,* 588 F.2d 1, 9–10 (2d Cir.1978); *Felice v. Long Island R.R. Co.,* 426 F.2d 192, 194–95 (2d Cir.), *cert. denied,* 400 U.S. 820, 91 S.Ct. 37, 27 L.Ed.2d 47 (1970); *New York Credit Men's Adjustment Bureau, Inc. v. Adler,* 2 B.R. 752, 757 (S.D.N.Y.1980); *Direction Assocs., Inc. v. Programming & Systems, Inc.,* 412 F.Supp. 714, 717–18 (S.D.N.Y.1976); *cf. United States ex rel. Connor v. Smith,* 527 F.2d 702, 705 (2d Cir.1975); *United States v. Beekman,* 155 F.2d 580, 584 (2d Cir.1946).

8. *Scholle v. Cuban-Venezuelan Oil Voting Trust,* 285 F.2d 318, 320 (2d Cir.1960); *Reprosystem, B.V. v. SCM Corp.,* 522 F.Supp. 1257, 1278–79 (S.D.N.Y.1981), *aff'd in part, rev'd in part,* 727 F.2d 257 (2d Cir.), *cert. denied,* 469 U.S. 828, 105 S.Ct. 110, 83 L.Ed.2d 54 (1984); *Decor by Nikkei Int'l v. Federal Republic of Nigeria,* 497 F.Supp. 893, 907–08 (S.D.N.Y.1980), *aff'd,* 647 F.2d 300 (2d Cir.1981), *cert. denied,* 454 U.S. 1148, 102 S.Ct. 1012, 71 L.Ed.2d 301 (1982); *Amies v. Wesnofsky,* 255 N.Y. 156, 163, 174 N.E. 436 (1931); *Ufitec, S.A. v. Trade Bank & Trust Co.,*

21 A.D.2d 187, 249 N.Y.S.2d 557, 560 (1st Dep't 1964), *aff'd,* 16 N.Y.2d 698, 261 N.Y.S.2d 893, 209 N.E.2d 551 (1965).

9. None of the cases cited by FNN for the proposition that a plaintiff must prove its ability to perform required proof comparable to that demanded by FNN. In most of them, plaintiff merely had to prove that it had the financial resources to tender a payment—not that a third party would approve a complicated agreement without modification.

In *Amies v. Wesnofsky,* 255 N.Y. 156, 163, 174 N.E. 436 (1931), a real estate broker sued for his commission from the seller after the buyer defaulted on the contract of sale. Although the broker was required to prove, in order to collect the commission, that the seller had hindered the buyer's performance, this is not the same as a requiring that the broker prove the speculative proposition that had the seller not interfered, the buyer would necessarily have performed.

To the extent that *Amies* is applicable to the instant case, King World has satisfied its requirements by showing that FNN's repudiation of the contract hindered any effort to obtain approval of the sublease.

consent to the sublease changed. FNN, having disavowed the sublease, would not have submitted such information as the landlord might have requested in reaching its decision. Requiring King World to bear the burden of proving what the landlord would have done had FNN not disavowed the sublease would permit FNN to reap an advantage from the situation created by its own unjustified repudiation of the contract.

Accordingly, although King World is required to prove it was ready, willing, and able to perform its part of the bargain, that proof need only go to matters not created by FNN's act of repudiation. King World has met this burden by proving that it had already vacated the premises so that FNN could move in, and by proving that it had forwarded the sublease to the landlord for its approval prior to FNN's repudiation. FNN, if it is to avoid liability on the ground that the landlord would not have approved the sublease, must bear the burden of proof on that issue. FNN has not met that burden. Its portrayal of its own financial condition as so questionable that the landlord would not have approved the sublease is not only conjectural, but highly speculative. FNN's 10Q SEC statement does not reveal FNN as an inherently undesirable subtenant; many large companies have periods of losses, and continue to function for years. Indeed, judicial notice may be taken of the fact that as of the time of trial, FNN's stock is listed on NASDAQ and it appears to be a viable company. Moreover, the master lease attached to the parties' sublease provides that in the event of default by FNN, King World would have remained liable to the landlord for the full rent owed. In the absence of an express agreement by which the landlord releases its primary tenant of such liability, the primary tenant's obligation for the full rent is not extinguished.[10] Given that King World would have remained liable for the rent, it is not apparent what financial objection the landlord could have had to accept-ing another party as also liable for the rent. Indeed, it would have the benefit of an additional obligor.

### III. Damages

Thus we reach the issue of damages. To be considered first are damages incurred by King World to date. These include damages incurred after FNN disavowed the contract and prior to commencement of rent payments by the Perfumer's Workshop. FNN's rent payments were to begin no later than December 15, 1985, given that the landlord had 45 days to approve the sublease after execution and that payments were to commence three months after receipt of the landlord's consent. The rent commencement date of the Perfumer's sublease was April 1, 1986. Damages to date also include damages incurred under the Perfumer's sublease so far.

King World, during the 3½ month period prior to the start of the Perfumer's sublease, and during the term of the Perfumer's sublease to date, has been damaged as follows: [11]

NOTE: * indicates that FNN, while disputing liability, did not object to King World's figure.

FNN's base rent of $9,065 per month (December 15, 1985 to April 1, 1986) ............... $31,727.50

Real estate tax increase of $14.54 per month (December 15, 1985 to April 1, 1986) ........ $50.89*

Porters' wage increase of $296.96 per month (January 1, 1986 to May 15, 1987) ........ $4,899.84*

(Note: the above three items were all included in King World's rent, upon which the commercial rent tax was collected.)

Commercial rent tax of 6%, pursuant to Title L, Chap. 46, New York City Administrative Code ........................ $2,200.69

Advertising expenses with regard to the Perfumer's sublease ......................... $588.25*

---

**10.** *Goldome v. Bonuch,* 112 A.D.2d 1025, 493 N.Y.S.2d 22 (2d Dep't 1985); *Iorio v. Superior Sound, Inc.,* 49 A.D.2d 1008, 374 N.Y.S.2d 76 (4th Dep't 1975).

**11.** Plaintiff also claimed entitlement to damages for electrical expenses, but produced no documents to substantiate that such expenses were incurred while the premises were unoccupied.

Legal expenses with regard to the Perfumer's sublease, which the Court finds reasonable and fair ................. $4,366.85

SUBTOTAL (DAMAGES TO DATE) ..................... $43,834.02

PREJUDGMENT INTEREST [12] ...................... $2,794.42

SUBTOTAL (DAMAGES PLUS PREJUDGMENT INTEREST) ............................. $46,628.44

In addition, King World is entitled to prospective damages for the balance of the term of the Perfumer's sublease as follows: [13]

Porter's wage increase of $296.96 per month, from May 15, 1987 to September 29, 1990 ...................... $12,026.88

Commercial rent tax of 6%, pursuant to Title L, Chap. 46, New York City Administrative Code .......................... $721.61

SUBTOTAL (prospective damages not reduced to present value) ...................... $12,748.49

SUBTOTAL (PROSPECTIVE DAMAGES, REDUCED TO PRESENT VALUE) [14] ................. $11,181.59

GRAND TOTAL ....................... $57,810.03

Judgment may be entered for the sum of $57,810.03 in favor of King World and against defendant FNN together with post-judgment interest from date as allowed by the State of New York.

So Ordered.

12. Plaintiff is entitled to prejudgment interest at the statutory rate of 9%, N.Y.C.P.L.R. sec. 5004, from the date each damage item was incurred; for example, the rental payment was to be due on the 15th of each month during December 1985 to March 1986, and thereafter on the first of each month. Plaintiff, however, has not submitted precise figures for interest. New York law permits interest to be calculated from "a single reasonable intermediate date," N.Y.C.P.L.R. 5001(b). Here, the date used is September 1, 1986, the approximate midpoint between May 15, 1987 and December 15, 1985, the date damages began to accrue.

13. Plaintiff has asserted no other claim for prospective damages.

14. The present value of the prospective damages is calculated using the current prime rate of interest of 8.5%.