# GEORGE HENRY, Plaintiff
## v.
# HESS OIL VIRGIN ISLANDS CORPORATION, Defendant

Civ. No. 1990-62

District Court of the Virgin Islands

Div. of St. Croix

August 25, 1995

Lee J. Rohn, Esq., *for plaintiff*

Bernard C. Pattie, Esq., Pattie & Daley, *for defendant*

MOORE, *Chief Judge*

## MEMORANDUM

This matter is before the Court on defendant's motions for remittitur or, alternatively, a new trial, pursuant to Rules 59 and 60 of the Federal Rules of Civil Procedure. For the reasons set forth below, the Court will order a new trial in this case.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On August 1, 1989, George Henry ("Henry" or "plaintiff"), then a 47-year old pipefitter foreman, fractured his right tibia and fibula after he tripped over a hose and slipped on some accumulated oil and water while working at a refinery owned by Hess Oil Virgin Islands Corporation ("HOVIC" or "defendant"). Henry's right leg was placed in a full cast. His medical expenses totaled $20,000, but he was never hospitalized and did not undergo surgery. In July, 1991, Dr. Orlando Fernandez, a worker's compensation physician,

165

examined plaintiff, found that his fractures had completely healed, and pronounced him fit to return to work.

At trial, however, plaintiff's medical expert, Dr. Sylvia Payne, testified that Henry's injuries were permanent in nature and limited the range of motion in his right ankle joint. As a result, he could not stoop, crouch, sit or stand for long periods, climb ladders, walk on uneven surfaces, drive an automobile for long periods, or lift heavy objects. Transcript of Trial ("Tr."), Vol. II at 28-30. Plaintiff also complained of intermittent pain, sexual dysfunction, and various stress-related physical ailments. Dr. Chester Copemann, plaintiff's vocational psychologist, testified that because of these physical ailments and attendant psychological problems, plaintiff would be limited to jobs that paid only the minimum wage or slightly greater. Dr. Chester Copemann's Comprehensive Clinical/Vocational Assessment at page 17 ("Dr. Copemann's Report"). Dr. Copemann admitted, however, that he never contacted any employers, including plaintiff's former employer, to determine whether or not they would employ Henry. Tr., Vol. II, at 254-55.

Based on Dr. Copemann's testimony and written report, Professor Lawrence Roberts, plaintiff's economic expert, gave two estimates for plaintiff's total wage loss. Assuming that plaintiff could work at the minimum wage, Professor Roberts calculated that plaintiff's past and future lost wages totaled $512,072.[1] Tr., Vol. III at 75-87. If Henry was completely disabled, this figure would increase to $631,200. In calculating the first figure, Professor Roberts relied exclusively on Dr. Copemann's report, which indicated that plaintiff could expect to earn only the minimum wage or slightly greater as a result of his disability.

Defendant's vocational expert, Dr. Michael Shahansaran, offered uncontradicted testimony that he contacted IMC, plaintiff's employer at the time of the accident, and was told that plaintiff showed no interest in resuming his prior job or any other alternative job that they offered. Tr., Vol. III at 171. Dr. Shahansaran also testified that plaintiff's employer was willing to make accommo-

---

[1] This figure was calculated as follows: [($124,738 in back wages + $506,462 in lost future earnings) - ($119,128 for minimum wage residual earning capacity)]. Professor Roberts did not deduct any taxes from the amount for lost future earnings.

dations for plaintiff's disability by offering him a different position at a substantially similar rate of pay. Tr., Vol. III at 224. The evidence also showed that plaintiff made no attempt to seek work with another employer. After a four-day trial, a jury awarded plaintiff $1.1 million for his injuries.

## II. MOTION FOR NEW TRIAL

The defendant now seeks a new trial or remittitur on several grounds. HOVIC first contends that a new trial is mandated because of newly discovered evidence, namely videotape and eyewitness testimony purportedly contradicting plaintiff's claims of disability.[2] Secondly, the defendant argues that it was severely prejudiced by several events at trial. These supposedly prejudicial events include: a) allegedly improper remarks by plaintiff's counsel to the press (out of court) and to the jury during closing arguments;[3] b) partiality or prejudice on the part of the jury as evidenced by its failure to find contributory negligence and its alleged failure to follow the Court's instructions on mitigation of damages; and c) the Court's admission of Professor Roberts' testimony on economic damages insofar as it relied on Dr.

---

[2] Although the defendant also seeks a new trial under Rule 60(b)(3) on the ground that the verdict was procured by fraud, this claim is exceedingly weak and does not merit discussion.

[3] The test for determining whether to grant a new trial in cases involving counsel misconduct is "whether the improper assertions have made it 'reasonably probable' that the verdict was influenced by prejudicial statements." *Greate Bay Hotel & Casino v. Tose*, 34 F.3d 1227, 1236 (3d Cir. 1994) (citing *Fineman v. Armstrong World Indus.*, 980 F.2d 171, 207 (3d Cir. 1992), *cert. denied*, 113 S.Ct. 1285 (1993)). A reporter assigned to cover the trial approached plaintiff's counsel in the courtroom during a recess just before the opening statements and asked what she was going to say to the jury in her opening statement (the reporter explained that it would be inconvenient to wait around for the speeches). Plaintiff's counsel obliged by providing a brief summary of her opening remarks, and some of her statements were quoted in the newspaper article the following day. The issue became entirely moot when, upon inquiry by the Court, it was established that none of the jurors had seen the article. While the Court strongly discourages counsel from making any comments to the media during trial, these particular comments did not prejudice this trial. Equally lacking in merit are defendant's criticisms of plaintiff's counsel's closing argument. There was nothing particularly inflammatory or otherwise improper, and there was no significant mischaracterization of the testimony. Indeed, the defendant's objections at trial were notably nonspecific. The court's charge, to which no objection was expressed, adequately cured any errors in counsel's closing arguments, by emphasizing that the jury's recollection of the testimony was controlling and that the arguments of counsel did not constitute evidence.

Copemann's Report. Finally, defendant contends that the jury award of $1.1 million was shockingly excessive and against the clear weight of the evidence in this case.

Because the Court agrees that it was prejudicial error to admit certain portions of Professor Roberts' testimony, it will order a new trial on the issue of damages only. In addition, the Court finds that the jury's award of from $448,800 to $568,000 for pain and suffering, loss of enjoyment of life, and mental anguish was shockingly excessive and against the clear weight of the evidence.

## A. Rule 59 Standards

■ There is no fixed standard for granting Rule 59 relief. Instead, the applicable standard varies with the grounds on which a new trial is sought.

1. Against the Weight of the Evidence

■■ Where the movant seeks a new trial on the basis that the verdict is against the weight of the evidence, the Court's power to overturn the jury's award is severely circumscribed. A court must tread carefully when a Rule 59 motion is predicated on this ground since,

> to some extent at least, [the court must] substitute[] [its] judgment of the facts and the credibility of the witnesses for that of the jury. Such an action effects a denigration of the jury system and to the extent that new trials are granted the judge takes over, if he does not usurp, the prime function of the jury as the trier of facts.

*Lind v. Schenley Indus., Inc.*, 278 F.2d 79, 90 (3d Cir.), *cert. denied*, 364 U.S. 835 (1960). In *Lind*, the Third Circuit Court of Appeals held that a jury's verdict should be more closely scrutinized where the trial is long and complicated and deals with a subject matter not lying within the ordinary knowledge of jurors. But where the subject matter of the trial is simple and easily comprehended by intelligent laymen, the verdict should be subjected to less demanding scrutiny. *Id.* at 90-91. *Lind* undoubtedly clarified the judge's role in reviewing Rule 59 motions, but it did not eviscerate it. By recognizing that the jury's verdict — even in the simple, familiar

168

case — requires some level of judicial scrutiny, *Lind* preserved the judge's essential function of preventing a miscarriage of justice.

■ While *Lind* redefined the judge's role in reviewing Rule 59 motions, it did not specify the criteria to be used in evaluating the jury's verdict. Over time, the Court of Appeals for the Third Circuit has refined the standards promulgated in *Lind* and has articulated factors to be considered in deciding whether to grant a new trial on the ground that the verdict is against the weight of the evidence. "[N]ew trials because the verdict is against the weight of the evidence are proper only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks our conscience." *Williamson v. Consolidated Rail Corp.*, 926 F.2d 1344, 1349 (3d Cir. 1991). Clearly, these factors are subjective and leave much to the discretion of the trial judge. But in addition to this "shocked conscience" standard, the Third Circuit has imparted a test of reasonableness. Thus, for a judge to disturb a jury award on "weight of the evidence" grounds, the verdict must "be so unreasonable as to offend the conscience of the court." *Murray v. Fairbanks Morse*, 610 F.2d 149, 152 (3d Cir. 1979). The Court of Appeals has consistently recognized that where there is no rational basis in the record for the jury's award, the trial court may reduce or vacate the award as excessive.[4]

■ Of course, whether or not the jury's verdict is rational can only be determined by weighing it against the evidence presented at trial. But how much supporting evidence need there be for the jury's verdict to withstand Rule 59 scrutiny? Put differently, at what point does the jury's verdict become unreasonable in light of the supporting evidence? Wright Miller & Kane are unequivocal. "[O]n a motion for a new trial . . . the judge may set aside the

---

[4] *See, e.g., Russell v. Monongahela Ry.,* 262 F.2d 349 (3d Cir. 1958); *Walther v. Pueblo Supermarket of St. Thomas, Inc.,* 433 F.2d 935, 936 (3d Cir. 1970); *Ednyak v. Atlantic Shipping, Inc.,* 562 F.2d 215, 225-26 (3d Cir. 1977), *cert. denied,* 434 U.S. 1034 (1978); *Murray v. Fairbanks Morse,* 610 F.2d 149, 153 (3d Cir. 1979); *David v. Pueblo Supermarket of St. Thomas, Inc.,* 740 F.2d 230 (3d Cir. 1984); *Gumbs v. Pueblo Int'l, Inc.,* 823 F.2d 768 (3d Cir. 1984); *Walters v. Mintec/International,* 758 F.2d 73, 80 (3d Cir. 1985); *Williams v. Martin Marietta Alumina, Inc.,* 817 F.2d 1030, 1041 (3d Cir. 1987); *Keenan v. Philadelphia,* 983 F.2d 459, 472 (3d Cir. 1992).

verdict even though there is substantial evidence to support it." 11 CHARLES A. WRIGHT, ARTHUR R. MILLER, & MARY K. KANE, FEDERAL PRACTICE AND PROCEDURE § 2806 (2d ed. 1995) ("WRIGHT & MILLER"). Many courts, including at least one in this circuit, have taken this view.[5] Although the Court of Appeals for the Third Circuit has not addressed this specific issue, *Lind* still casts a large shadow. *Lind* teaches that the trial judge must accord the jury's verdict greater weight when the subject matter of the trial is simple and readily understood. Thus, the quantum of evidence necessary to shield the jury's verdict from a successful Rule 59 attack is lesser for the simple case than for the complex suit.

■■ But the verdict must still be weighed. *Lind* does not stand for the proposition that the court must abandon its scrutiny upon finding a mere scintilla of evidence to support the jury's verdict. Indeed, almost every case that reaches the jury has some evidentiary basis upon which the jury could find for either party, otherwise the court would enter judgment as a matter of law at the close of the evidence under FED. R. CIV. P. 50. A Rule 59 motion requires a more discriminating review of the evidence. The trial judge must view the evidence as a whole, weighing the relative strengths and weaknesses of each party's case, and bearing in mind the credibility of the witnesses, any conflicting testimony, and the forcefulness of the evidence. It is this holistic view of the case that makes the trial judge uniquely suited to decide whether the jury's verdict was shockingly excessive or rational. Hence, even where the evidence is sufficient to send the case to the jury, it nevertheless may be inadequate to support the jury's verdict. To survive Rule 59 scrutiny on "weight of the evidence" grounds, the jury's verdict must have more than just some evidentiary basis; it must be plausible in light of the full evidentiary record. Under this standard, the court may grant a new trial only if the verdict is so clearly against the weight of the evidence as to constitute a miscarriage of justice. *Williamson*, 926 F.2d at 1349.

---

[5] *See, e.g., Lama v. Borras*, 16 F.3d 473, 477 (1st Cir. 1994); *Poynter by Poynter v. Ratcliff*, 874 F.2d 219 (4th Cir. 1989); *Bevevino v. Saydjari*, 574 F.2d 676, 683 (2d Cir. 1978); *Balaska v. National Tea Co.*, 328 F. Supp. 147, 148 (W.D. Pa. 1971).

■■ When a party challenges the *size* of the jury's verdict as being against the weight of the evidence, the standard is the same. The mere fact that the judge believes the jury to be unduly generous is not sufficient to warrant a new trial or remittitur. *Dunn v. HOVIC*, 1 F.3d 1362, 1367 (3d Cir. 1993). Rather, the judge must find that no rational jury, acting on the basis of the full evidentiary record, and without being inflamed by passion or prejudice or other improper consideration, could have awarded such a large sum as damages. *See Gumbs v. Pueblo*, 823 F.2d 768, 773 (3d Cir. 1987). The trial judge has discretionary authority to afford a victorious plaintiff the choice between accepting a reduced verdict, or granting a new trial. *Allied Chemical Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36 (1980); *Kazan v. Wolinski*, 721 F.2d 911, 914 (3d Cir. 1983).

2. Inadmissible Evidence

■ When a motion for a new trial is premised on a ground other than that the verdict was against the weight of the evidence, the trial court has much greater discretion. As *Lind* observed, when the ground for a new trial is that some "undesirable or pernicious element has occurred or been introduced into the trial," the trial judge "necessarily must be allowed wide discretion in granting or refusing a new trial." *Lind*, 278 F.2d at 90. It is this second, more flexible standard that courts follow when the Rule 59 movant claims that evidence presented at trial was inadmissible. *See Link v. Mercedes-Benz of North America, Inc.*, 788 F.2d 918, 921-22 (3d Cir. 1986).

### B. Rule 60 Standards

■ To prevail on a Rule 60(b)(2) motion for a new trial, the movant must meet three requirements. "A party is entitled to a new trial only if such evidence is (1) material and not merely cumulative, (2) could not have been discovered prior to trial through the exercise of reasonable diligence, and (3) would probably have changed the outcome of the trial." *Bohus v. Beloff*, 950 F.2d 919, 930 (3d Cir. 1991) (citing *Stridiron v. Stridiron*, 698 F.2d 204, 208 (3d Cir. 1983)). The term "newly discovered evidence" means "evidence of facts in existence at the time of trial of which the aggrieved party was excusably ignorant." *Id.* (citation omitted). In

171

this circuit, Rule 60(b)(2) motions are viewed as "extraordinary relief which should be granted only where extraordinary justifying circumstances are present." *Plisco v. Union R. Co.*, 379 F.2d 15, 17 (3d Cir.), *cert. denied*, 389 U.S. 1014 (1967).

## III. DISCUSSION

### A. After-discovered Evidence

Defendant first contends that a new trial is warranted under Fed. R. Civ. P. 60(b)(2) because of "newly-discovered evidence", consisting of certain videotape evidence obtained through post-trial, surreptitious surveillance of the plaintiff, together with the affidavit testimony of alleged eyewitnesses to plaintiff's post-trial activities. HOVIC contends that this newly-discovered evidence plainly shows that plaintiff is much less disabled than his trial testimony admitted. Specifically, Henry and his witnesses testified at trial that he is afflicted with a permanent limp as a result of the accident, because of lack of flexibility in his ankle. Plaintiff also testified that he would have difficulty driving an automobile. The post-trial surveillance tapes, defendant contends, show plaintiff walking without noticeable difficulty and driving an automobile. In addition, defendant has presented affidavits from persons who allegedly witnessed plaintiff participating in a social event on a beach in a manner allegedly inconsistent with the impairments described at trial.

The Court will not grant a new trial on the basis of this so-called newly-discovered evidence. In the first place, defendant has not sufficiently shown that this evidence was not available before trial, since it was always open to the defendant to videotape plaintiff's pre-trial activities surreptitiously. Obviously, as noted by plaintiff's counsel, there are risks involved in pursuing that course of action: pretrial surveillance of an injured plaintiff may antagonize a jury or may lead the jury to believe that the defendant is impressed with the potential magnitude of the damages. Whatever the reason, the defendant did not conduct adequate pretrial

172

surveillance, and it cannot now revise its strategy in the hope of obtaining a better result at a retrial.[6]

Apart from the issue of untimeliness, however, the videotape evidence is hardly overwhelming. The videotapes do show plaintiff driving an automobile on at least two occasions, but such evidence does not significantly undermine plaintiff's trial evidence, which was to the effect that he would have "difficulty" driving an automobile. The videotapes also include a footage of plaintiff walking and climbing stairs. In one brief exposure, plaintiff is shown walking away from the camera without a noticeable limp, showing greater flexibility in his ankle than the trial testimony would have admitted. Having viewed the proffered videotapes in their entirety, the Court is not persuaded that this evidence would have been likely to alter the jury's findings of liability, although it might have affected the amount of the verdict. Since a new trial will be ordered on damages for other reasons, we do not reach the question of whether this videotape evidence or eyewitness testimony, standing alone, would justify a new trial on damages.

## B. ALLEGED TRIAL ERRORS

### 1. Contributory Negligence

Defendant argues that a new trial should be granted because the jury's verdict, completely exonerating Henry from any contributory fault, is contrary to the overwhelming weight of the evidence.

■ Although it is certainly true that the jury might reasonably have attributed some portion of the fault to the plaintiff, there was a rational basis for the verdict on that score. There is no doubt that HOVIC was entirely responsible for creating the conditions which brought about the accident: spilled oil, a hose stretched across the floor, water sprayed over the area in an attempt to wash away the

---

[6]The only explanation offered by the defendant for its belated acquisition of this videotape evidence is the vague assertion that plaintiff's deceit was so thorough that he did not reveal his true physical ability until after the jury's verdict. Defendant does not assert that plaintiff was being held in a secret hideaway during the years preceding the trial or that it was somehow plaintiff's fault that no pretrial surveillance occurred. In particular, HOVIC did not offer any reason why it could not find any eyewitnesses to testify at trial to Henry's alleged lack of disability.

oil-spill. And although defendant presented evidence suggesting that plaintiff himself had some supervisory responsibility for safety conditions at that site, the jury properly could have rejected that evidence and accepted the testimony of Henry and his witnesses to the contrary. Accepting that view of the evidence, the only basis for a finding of contributory negligence would have been plaintiff's failure to notice the hose and spilled oil before he tripped. Here again, however, there was testimony which, if accepted by the jury, established that the hose was dark in color and not readily noticeable, and that shadows may well have obscured the location where the accident occurred. In short, under the Rule 59 standards outlined above, the jury's verdict on contributory negligence is not so irrational or against the clear weight of the evidence to permit judicial interference.

### 2. Admissibility of Professor Robert's Testimony on Lost Future Earnings

Defendant also contends that the Court erred in admitting into evidence, over defendant's objection, the testimony of plaintiff's economic expert, Professor Lawrence Roberts, which was based entirely on Dr. Copemann's assessment of plaintiff's prospects for employment. Having carefully reviewed the trial record, the Court agrees.

Specifically, we find that Professor Roberts' estimate of plaintiff's future earnings loss was based on Dr. Copemann's overly speculative and unsubstantiated conclusions about Henry's post-injury earning capacity, or lack thereof. To the extent that Professor Roberts based his estimates and testimony on Dr. Copemann's claim that plaintiff was capable of earning only the minimum wage or slightly greater, this testimony was inadmissible under Rules 702 and 703 of the Federal Rules of Evidence. Also, since both Dr. Payne and Dr. Copemann found that plaintiff was able to perform some work, it was improper, and severely prejudicial to the defendant, for Professor Roberts to offer an alternative future wage loss estimate that assumed that plaintiff was completely disabled. This second wage loss estimate should have been excluded under Rule 403.

174

Rule 702 has two major requirements.[7] First, the witness proffered to testify must be an expert. Second, the expert's testimony must assist the trier of fact. In other words, the process used by the expert in formulating his opinion must be reliable. *In Re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717, 741-42 (3d Cir. 1994) (Becker, J.) (*Paoli II*), *cert. denied*, 115 S.Ct. 1253 (1995). The trial judge must ensure that the methods used by the proffered expert are based on the "methods and procedures of science" rather than on "subjective belief or unsupported speculation." *Daubert v. Merrell Dow Pharm., Inc.*, ____ U.S. ____, 113 S.Ct. 2786, 2795 (1993); *Paoli II*, 35 F.3d at 742. Also, there must be a connection between the technical or scientific testimony proffered and the factual issues in dispute in the case. *Paoli II*, 35 F.3d at 743. In determining whether an expert's testimony is reliable, "[t]he focus . . . must be solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 113 S.Ct. at 2797.

In *Paoli II*, Judge Becker also emphasized the trial judge's preeminent role in evaluating the data underlying an expert's opinion under Fed. R. E. 703.[8]

> [I]t is the judge who makes the determination of reasonable reliance, and that for the judge to make the factual determination under Rule 104(A) that an expert is basing his or her opinion on a type of data reasonably relied upon by experts, the judge must conduct an independent evaluation into reasonableness.
>
> . . . .
>
> . . . [W]hen a trial judge analyzes whether an expert's data is of a type reasonably relied on by experts in the field, **he or she**

---

[7] Rule 702 provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

[8] Rule 703 reads:

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

**should assess whether there are good grounds to rely on this data to draw the conclusion reached by the expert.**

*Paoli II*, 35 F.3d at 748-49 (emphasis added). In deciding whether there are good grounds for the expert's conclusions, the court may consider the practice of other experts in the field **as well as** any other factors the judge deems relevant. *Id.*

▉ Even where an expert's testimony complies with Rules 702 and 703, it nevertheless may be excluded under Rule 403 if its probative value is substantially outweighed by its prejudicial effect or by its potential to confuse or mislead the jury.[9] Admittedly, exclusion under Rule 403 will be rare, *Paoli II*, 35 F.3d at 747 n.16. Because expert evidence is often more misleading than other evidence, however, Rule 403 gives judges more power over experts than over lay witnesses, *Daubert*, 113 S.Ct. at 2798.

### a. *The Unreliability of Professor Roberts' Minimum Wage Projections*

▉ Measured against Rule 702's reliability standard and Rule 703's "good grounds" inquiry, Professor Roberts' method of quantifying plaintiff's future earnings loss is wanting. Professor Roberts' estimate of plaintiff's future earning capacity was based entirely on Dr. Copemann's testimony and conclusions.[10] Yet, Dr. Copemann's Report was methodologically unreliable. Based mainly on interviews with plaintiff and vocational and psychological testing, Dr. Copemann found that plaintiff should be restricted to work falling in the "sedentary to light strength demand category" and that any such full time work must allow him to work frequently and not subject him to physical demands on his lower right foot. Dr. Copemann's Report at 17-18. In evaluating plaintiff's post-injury earning potential, Dr. Copemann noted:

---

[9] Rule 403 provides:
  Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

[10] Whether or not Dr. Copemann's Report and testimony were admissible is not essential to our analysis under Rule 703, since the Rule allows experts to base their testimony on hearsay or otherwise inadmissible data. Such data must still meet the requirements of Rule 702, however.

176

Prior to his injury and based on Henry's age, education, previous work experience, and the results of the standardized tests administered to him, it is my opinion that he had the capacity to perform work which . . . constitutes about 3.9% of the male work force jobs available nationally. . . . [H]e is now able to perform work which constitutes about less than .1% of all jobs existing nationally, with only a marginal number of those being available locally, paying the Virgin Islands Minimum Wage or slightly greater (e.g. Night Watchman,— restricted walking; Watch or other Assembler; Tailor—self-employed; Ticket Taker, Parking Lot Attendant, Inspectors, Testers, Graders).

Dr. Copemann's Report at 17. Dr. Copemann's Report assumed that because of his injuries, plaintiff could no longer work as a turnaround foreman and would have to pursue another vocation; but there was no reason to assume, as Dr. Copemann did, that this alternative vocation need be with another employer. In other words, Dr. Copemann's conclusion that plaintiff was capable of earning only the minimum wage or slightly greater was premised on his unsubstantiated belief that Henry would be forced to fend for himself in the St. Croix job market. In fact, Dr. Copemann never contacted IMC to determine plaintiff's employment status or to ascertain whether work falling in the "sedentary to light strength demand category" was available with the company.

Not only did Dr. Copemann fail to contact Henry's former employer, the record indicates that he also neglected to contact any other potential employer. Henry neither applied for nor sought employment of any kind after the accident, and Dr. Copemann never contacted any St. Croix employers to determine whether jobs falling into the "sedentary to light strength demand category" were available and what their rate of pay would be. Equally significant, Dr. Copemann never produced data from the V.I. Department of Labor or any another local government source to substantiate his claim that the jobs for which plaintiff was qualified paid only the minimum wage. Further, Dr. Copemann did not adequately consider whether the plaintiff, who had done previous work in sales and had considerable supervisory experience, could

177

be retrained in other vocational areas that paid more than the minimum wage.[11]

■ We conclude, therefore, that Dr. Copemann's statement limiting plaintiff's post-injury earnings to the minimum wage or slightly greater was unreliable and lacked an adequate factual foundation under FED. R. CIV. P. 702 and 703. Both *Daubert* and *Paoli II* require that we exclude any expert testimony, such as Professor Roberts', which is based on "subjective belief or unsupported speculation." *Daubert*, 113 S.Ct. at 2794. And Rule 703 permits us to look behind Professor Roberts' testimony to the underlying data supporting his calculations. Since Professor Roberts built his wage loss edifice on Dr. Copemann's unfounded conclusions about plaintiff's post-injury earning capacity, his testimony on economic damages was itself unreliable and thus inadmissible.[12]

*b. Professor Roberts' Estimate Which Assumed that Plaintiff Was Unemployable was Misleading*

■ At the trial, Professor Roberts was allowed to present two estimates of plaintiffs' future earnings loss to the jury: the first ($512,072) presumed that plaintiff could earn only the minimum wage while the second ($631,200) was based on the assumption that plaintiff could not work at all. This second estimate should have been disallowed, since there was no evidence in the record that plaintiff was completely disabled.

Plaintiff's medical expert, Dr. Payne, testified that because of plaintiff's injury, he could no longer work as a turnaround foreman due to the physical demands of that occupation. Tr., Vol. II at 35-35.[13] Although Dr. Payne also testified that plaintiff's physical limitations would likely prohibit him from working for eight hours

---

[11] In fact, absent a brief encounter with a Workman's Compensation rehabilitation counselor in 1991, Henry admitted that he never sought retraining or rehabilitation counseling. Tr., vol. II, at 165.

[12] Well before *Daubert* and *Paoli II*, the Court of Appeals for the Third Circuit acknowledged that an expert's testimony on economic damages is only as sturdy as the foundation on which it is built. *Benjamin v. Peter's Farm Condominium Owners Assoc.*, 820 F.2d 640, 643 (3d Cir. 1987); *Gumbs v. International Harvester, Inc.*, 718 F.2d 88, 98 (3d Cir. 1983).

[13] This testimony was contradicted by Dr. Fernandez' opinion in August of 1991 that Henry was fit to return to work in the same capacity, having undergone eighteen months of physical therapy.

178

a day, five days a week, *id*. at 93-94, she stated, unequivocally, "[Henry] can perform whatever doesn't entail a lot of standing, a lot of walking, climbing ladders, or stairs, and uneven surfaces," *id*. at 93. In short, although plaintiff allegedly could no longer work as a turnaround foreman, Dr. Payne testified that he could still perform sedentary work, even if for less than eight hours per day. *See also* Dr. Payne's Report at 3.

Similarly, Dr. Copemann, plaintiff's vocational psychologist, found plaintiff to be at most 80% disabled and "able to perform work" that constituted less than .1% of all jobs existing nationally. Dr. Copemann's Report at 17. At trial Dr. Copemann testified that plaintiff has exhibited depression, hostility, anger, and low self-esteem as a result of his injury, Tr., Vol. II at 220-223, which would surface in a job interview, thereby impairing his ability to obtain work, *id*. at 246-247. In Dr. Copemann's words, plaintiff tended to "wear his pain on his sleeves." *Id*. at 246. Yet, these psychological impairments were not totally disabling. *See, e.g., id*. at 224. They were treatable with medication and counseling, neither of which plaintiff had sought or undertaken. *Id*. at 251. Thus, while plaintiff's injury limited the range of jobs that he could perform, it did not render him incapable of work, even if only for short periods of time.[14]

Because neither Dr. Payne nor Dr. Copemann testified that plaintiff was completely disabled, Professor Robert's second set of calculations, which presumed that plaintiff would never again be employed, was misleading and prejudicial under Rule 403 of the Federal Rules of Evidence. As such, it was inadmissible. *Compare Senko v. Fonda*, 384 N.Y.S.2d 849, 852-53 (N.Y. App. Div. 1976) (finding that it was error to calculate lost future wages based on complete disability where evidence showed only partial disability).

---

[14] Although an individual's psychological impairment may be compensable in the form of diminished earning capacity, (*e.g.* reduced promotion potential, unwillingness to work overtime), we question whether one physically capable of working but psychologically unwilling to do so can ever be considered completely disabled. Moreover, to a large degree, the jury's award for loss of enjoyment of life included a component for plaintiff's depression.

## III. MOTION FOR REMITTITUR

██ Even if we were to find that the trial errors described above did not require a new trial on damages, we nevertheless would be compelled to order a new trial or remittitur because of the excessiveness of the jury award. The jury's award of from $567,928 to $448,800[15] for pain and suffering and loss of enjoyment of life was shockingly excessive and not rationally based on the evidence adduced at trial.

The extent of plaintiff's injuries was sharply disputed during the trial. While Dr. Payne testified that plaintiff's injuries were permanent and degenerative, Dr. Fernandez, a worker's compensation physician, pronounced plaintiff fit to return to work as a turn-around foreman a full year before Dr. Payne first examined Henry. Before the accident, Henry engaged in activities such as playing cricket and Chinese checkers with his children, dancing, attending sporting events, and going to the beach. Tr., vol. II at 146. But like the plaintiff in *Gumbs v. Pueblo*, 823 F.2d 768, 773 (3d Cir. 1987), he was never hospitalized for his injury, never underwent surgery and suffered no obvious disfigurement. Furthermore, plaintiff offered no evidence that the pain he suffered could not be alleviated (if only for a few hours) by medication and therapy, thereby enabling him to participate in some of the aforementioned activities. Finally, while Henry complained of a hosts of ailments, as Dr. Copemann conceded, many of these lacked any objective findings.[16] Having carefully considered all of the evidence in this case, and based on our review of verdicts involving similar injuries, this Court is firmly of the opinion that a verdict of

---

[15] Because the jury was not asked to segregate each component of its award, we cannot calculate the amount awarded for pain and suffering with precision. Yet, if the jury determined that plaintiff was unable to work, then of the $1.1 million award, $631,200 was for lost earning capacity, $20,000 for medical expenses and $448,800 for pain and suffering, mental anguish and loss of enjoyment of life. On the other hand, if the jury found that plaintiff was capable of earning the minimum wage or greater, then the award for pain and suffering and loss of enjoyment of life was $567,928 ($1.1 million — $512,072 — $20,000) or greater.

[16] Among the many ailments that Mr. Henry attributed to his slip and fall were loss of energy, irregular sleep, dizziness, muscle twitches, gas, hallucinations, fuzziness, thinking errors, urinary problems, pain in the testicles, change in bowel habits, shortness of breath, nasal problems, and greater irritability. *See* Dr. Copemann's Report at 6-8.

$120,000 for pain and suffering would not have been low, and that any verdict in excess of $200,000 is beyond the limits of what the evidence would reasonably support. *See Gumbs v. Pueblo*, 823 F.2d at 775; *Williams v. Martin Marietta Alumina*, 817 F.2d 1030, 1040-41 (3d Cir. 1987).

A separate order follows.

## ORDER

AND NOW, this 25th day of August 1995, upon consideration of defendant's post-trial motions, plaintiff's responses, and for the reasons set forth in the Court's Memorandum of even date, it is hereby ORDERED:

1. That defendant's motion for a new trial is, as to liability issues is DENIED.

2. That defendant's motion for a new trial is, as to damage issues is GRANTED.