**VIRGIN ISLAND MARITIME SERVICE, INC., Plaintiff**

**v.**

**PUERTO RICO MARITIME SHIPPING AUTHORITY, Defendant**

Civ. No. 1992-226

District Court of the Virgin Islands

Div. of St. Thomas and St. John

June 24, 1997

Fernando L. Gallardo, Esq., (Woods & Woods), San Juan, Puerto Rico, Alan R. Feuerstein, Esq., Buffalo, NY, and Ashley R. Andrews, Esq., New York, NY, *for Plaintiff*

195

RICHARD H. HUNTER, ESQ., St. Croix, U.S.V.I., and J. RAMON RIVERA MORALES, ESQ., (Jimenez, Graffam & Lausell), San Juan, Puerto Rico, *for Defendant*

MOORE, *Chief Judge*

## MEMORANDUM

A Jury trial took place on February 20 and 21, 1997 relating to a contract dispute between the parties. At the conclusion of that trial the jury returned a verdict in plaintiff's favor in the amount of $2,911,297.00. Defendant has submitted a post-trial motion to dismiss, for judgment as a matter of law, or alternatively for new trial. The respective grounds for these motions are sovereign immunity, an allegedly unambiguous contract, and a jury verdict which is not rationally related to the evidence. Before addressing these claims, a thorough discussion of the procedural history is required.

## I. Procedural History

Plaintiff Virgin Islands Maritime Services, Inc. ["VIMS"] brought three causes of action against defendant Puerto Rico Maritime Shipping Authority ["PRMSA"] in its January 19, 1993 Amended Complaint. VIMS alleged in Count I that PRMSA had breached the parties' August 1, 1979 Agency Agreement ["Agency Agreement"] by delivering to VIMS on June 26, 1992 a written notice of termination, effective in ninety days, which termination was not based on any "good cause" as that term was defined in the Agency Agreement. Count II of the Amended Complaint alleged that the relationship between VIMS and PRMSA was that of a franchisee and franchisor within the meaning of the Virgin Islands Franchised Businesses Act, V.I. Code Ann. tit. 12A, § 130, and that PRMSA was liable to VIMS under that act. Count III alleged that PRMSA had tortiously interfered with prospective contractual relations between VIMS and a Florida shipper, Seaboard Marine, by advising VIMS that if it became an agent of another shipping line, VIMS would suffer from a conflict of interest and be in violation of the agency agreement. Count IV of the Amended Complaint, and the entirety of PRMSA's February 10, 1993 counterclaim, excepting the

first claim for relief, were settled between the parties shortly before trial. PRMSA's first claim for relief surviving the settlement was that PRMSA had validly terminated VIMS by giving them ninety days notice, which was all that was required after the initial three-year term of the contract had expired.

In the Joint Final Pretrial Order submitted by the parties to the Court on January 31, 1997, PRMSA alleged that the claims of VIMS were not justiciable in federal court because PRMSA was an instrumentality and arm of the Government of the Commonwealth of Puerto Rico under Title 23, P.R. Laws Ann. § 3051 *et seq.* and thus is immune from suit in federal court under the Eleventh Amendment of the Constitution. The parties submitted briefs addressing the question of the District Court's jurisdiction before trial. The Court made a pre-trial ruling that it had jurisdiction and denied PRMSA's motion, although no written opinion was issued at that time.

In opening statement plaintiff's counsel told the jury that VIMS would be seeking $871,000.00 in damages for breach of contract and an additional $1.9 million in damages for tortious interference with prospective contractual relations.[1] At the conclusion of the plaintiff's case-in-chief, the franchise claim (Count II) and the tortious interference claim (Count III) were dismissed upon defendant's Rule 50 motion for a directed verdict.

PRMSA also moved for a directed verdict on the remaining breach of contract claim (Count I) on the basis that the contract was unambiguous and that, as a matter of law, the Agency Agreement gave each party the right to terminate the contract after the initial three year term of the agreement by giving a ninety-day written notice. The Court withheld ruling on the breach of contract claim, but denied PRMSA's other assertions that VIMS had failed to establish any damages to a reasonable degree of certainty, that VIMS' own corporate records showed continuous financial losses, that the absence of economic expert testimony was fatal, that a projected ten-year period for claimed lost profits was speculative, that no evidentiary bases had been established for allowing

---

[1] No specific amount was mentioned for Count II. Presumably, recovery would only be allowed under either Count I or Count II but not both, since Count I was for breach of an agency agreement and Count II was for breach of a franchise agreement.

judicial notice of Virgin Islands Department of Labor industry growth increases, and that no damage claims should be permitted beyond March 3, 1995 when PRMSA went out of business and ceased all operations.[2]

At the close of all evidence, PRMSA renewed its directed verdict motions. The Court again withheld ruling on the question of whether the contract was unambiguous and whether good cause was required for termination, and denied the balance of the Rule 50 motion.

In summation, VIMS asked the jury to conclude that its agency contract had been improperly terminated and that VIMS would have received average net operating profits of $70,918.00 annually had the agency agreement continued. VIMS asked the jury to award it the sum of $709,180.00, representing theorized net lost profits over a ten year period. In its argument to the jury, PRMSA pointed out that the June 26, 1992 termination letter complied with the provisions of Article 12(A) of the Agency Agreement, that Mr. Francis, the sole owner of VIMS, had acknowledged in writing shortly thereafter that the contract could be terminated with a ninety-day written notice, and that VIMS' financial records (Exs. G1, G2, G3, G4 and G5; Ex. 48) revealed an average annual operating loss of $17,500.00, were reviewed by the jury. In rebuttal, VIMS made arguments based on matters not in evidence, including assertions that plaintiff had lost millions of dollars and that VIMS employees had lost jobs as a result of PRMSA's wrongful termination. PRMSA's motion for a mistrial and PRMSA's request for admonishment were denied.

The jury began deliberating at approximately 5:00 p.m. on Friday, February 21 and reached a verdict about two hours later, awarding VIMS $2,911,297.00 for breach of contract on Count I.

## II. The Agency Agreement

The issues relevant to trial and raised by the post-trial motion regarding Count I are whether the Agency Agreement (1) is unambiguous, and (2) only allowed PRMSA to terminate VIMS

---

[2] PRMSA has renewed its motion for judgment as a matter of law in regard to the speculative nature of the economic damages, and for a new trial to the extent that no concrete information regarding damages was brought forth.

with ninety days notice for good cause. The relevant provision of the Agency Agreement is Article 12, which states:

(A) This agreement shall for all purposes be effective as of the date herein above upon execution by both parties, and shall remain in effect for three (3) years thereafter. Unless notice of a party's intention to terminate this Agreement at the end of such three (3) year period be given by such party to the other at least ninety (90) days in advance of the end of such year, this Agreement shall continue in full force and effect thereafter until terminated by notice given by the party desiring to terminate this Agreement to the other at least ninety (90) days in advance of the specified termination date.

(B) PRMSA may terminate this agreement upon 90 days advance notice in the event of,

(a) Gross negligence on the part of the Agent in the performance of his duties.

(b) Unlawful or wrongful acts by the Agent to the detriment of PRMSA's interests.

(c) The failure of PRMSA to achieve a reasonable share of the market as a result of lack of activity on the part of the Agent.

(Plaintiff's Ex. 3). The undisputed evidence at trial showed that on June 26, 1992 PRMSA had provided VIMS with written notice of termination effective on September 26, 1992, pursuant to Article 12 of the Agency Agreement. (Ex. 16.) The issue presented to this Court both during trial and in PRMSA's post-trial motion for judgment as a matter of law on Count I is whether the specified grounds for termination delineated in 12(B) limited PRMSA's ability to terminate the agreement only during the initial three-year term, as argued by PRMSA, or continued to limit PRMSA if the parties allowed the Agency Agreement to remain in effect after its initial three-year term, as asserted by VIMS.

## III. The Jurisdiction of the District Court

### A. *Claims of Sovereign Immunity*

Before trial, PRMSA moved to dismiss the entire case on the

ground that it was an arm of the government of the Commonwealth of Puerto Rico ["the Commonwealth"] and therefore entitled to share in the Commonwealth's sovereign immunity. The Court here recites the basis for denying its renewed contention.

Whether PRMSA is entitled to participate in the Commonwealth's sovereign immunity has been confronted by several courts. The most recent case, which is also most apposite, is *Trans American Recovery Services, Inc. v. Puerto Rico Maritime Shipping Authority ["Trans American I"]*, 820 F. Supp. 38 (D.P.R. 1993), *reversed upon reconsideration ["Trans American II"]*, 850 F. Supp. 103 (1994). In that case, a contractor brought an action seeking to recover damages suffered as a result of PRMSA's alleged unjustified cancellation of a demurrage billing and collection contract. Upon reconsideration, the court found that PRMSA was not entitled to immunity.

The court reversed itself based on the intervening opinion of the Court of Appeals for the First Circuit in *Metcalf & Eddy, Inc. v. Puerto Rico Aqueduct and Sewer Authority*, 991 F.2d 935 (1st Cir. 1993). The district court found the principal factor in deciding whether Eleventh Amendment immunity exists to be whether the funds to satisfy a potential judgment would be drawn from the public treasury. *Trans American II*, 850 F. Supp. at 108.[3] Since

---

[3] In the first decision by the United States District Court for the District of Puerto Rico, the court applied the dominant factors of (1) whether the funds to satisfy a potential adverse judgment will be drawn from the public treasury or from the independent funds of the agency, and (2) whether the agency exercises a traditional governmental function as opposed to a proprietary function. The other factors of lesser importance were (3) whether the entity has been incorporated; (4) whether the entity may sue or be sued; (5) whether its property is immune from state taxation; (6) whether the sovereign has immunized itself from responsibility for the entity's operations. The Court noted that while PRMSA had a separate treasury from the government of Puerto Rico, the Commonwealth guaranteed bonds issued by PRMSA up to $60 million. Additionally, PRMSA had received at least $98 million from the Commonwealth since 1984 in order to ensure its operation. *Trans American Recovery Services, Inc. v. Puerto Rico Maritime Shipping Authority,["Trans American I"]*, 820 F. Supp. 38, 42-43 (D.P.R. 1993), *reversed upon reconsideration, ["Trans American II"]*, 850 F. Supp. 103 (1994). 42-43. Moreover, the court noted that PRMSA was obligated to turn over profits and make judicial accountings with the legislature of the Commonwealth.

The court also found that PRMSA was performing a vital governmental function, and not a proprietary one, namely the guarantee of adequate shipping which the private sector was unable or unwilling to provide. As such, contracts entered into in this capacity were also

PRMSA had not brought forth evidence that monies would be taken from the public treasury to satisfy a potential judgment, the court found that PRMSA was not entitled to immunity based on some support from the Government. The court also held that the function performed by the plaintiff on behalf of PRMSA was identical to the functions the plaintiff performed for many other private parties. Therefore, upon reconsideration, the district court found that PRMSA was not entitled to Eleventh Amendment immunity.

■ This Court adopts the reasoning of the United States District Court for the District of Puerto Rico in *Trans American II* that PRMSA is not entitled to sovereign immunity,[4] although the factors utilized by the Court of Appeals for the Third Circuit are not identical to those delineated by the First Circuit Court of Appeals in *Metcalf & Eddy*. Under conflict of laws principles, the law of Puerto Rico governing sovereign immunity claims, as applied in *Trans American* and *Metcalf & Eddy*, controls this Court's decision in this case. The courts which have addressed whether claims of sovereign immunity are substantive or procedural law have concluded that they are substantive, which requires a choice of law analysis.[5] Moreover, both parties stipulated in the Agency Agreement that the substantive law of Puerto Rico governs this agreement. The Court further notes that, even if sovereign immunity

---

part of PRMSA's governmental function. *Id.* at 44. Accordingly, PRMSA was granted sovereign immunity in *Trans American I*.

[4] PRMSA has cited other cases dealing with immunity issues involving PRMSA, such as, *Zapata Gulf Marine Corp. v. Puerto Rico Maritime Shipping Authority*, 682 F. Supp. 1345 (E.D. La. 1988). However, the analysis used by the court in that case dealt with immunity from anti-trust claims, not Eleventh Amendment immunity. Moreover, other courts have come to the opposite conclusion. *See, e.g., Caribe Trailer Systems, Inc. v. Puerto Rico Maritime Shipping Authority*, 475 F. Supp. 711 (D.D.C. 1975).

[5] *See, e.g., Reed v. University of North Dakota*, 543 N.W.2d 106, 108-109 (Minn. Ct. App 1996); *Department of Corrections v. McGhee*, 653 So.2d 1091, 1092-1093 (Fla. Dist. Ct. App. 1995); *Aurdal v. Metronorth Commuter Railroad*, 1993 WL 454281 at *1-*2 (Conn. Super. Ct. 1993); *Schoeberlein v. Purdue University*, 544 N.E.2d 283, 285-286 (Ill. 1989); *Haberman v. Washington Public Power Supply System*, 744 P.2d 1032, 1066 (Wash. 1987)(en banc); *Biscoe v. Arlington County*, 738 F.2d 1352, 1359 (D.C. Cir. 1984), *cert. denied*, 469 U.S. 1159 (1985); *Southwell v. Widing Transportation, Inc.*, 676 P.2d 477 (Wash. 1984); *Johnson v. Spider Staging Corp.*, 555 P.2d 997 (Wash. 1976).

were determined under the law of this forum, the result would be the same.[6]

■ Thus applying the law of Puerto Rico, this Court concludes that from 1979 to 1992 when the Agency Agreement was in effect, PRMSA was not entitled to sovereign immunity. The most important factor, the source of funds to pay a judgment, would come from PRMSA's separate funds, although those funds might largely be supplied by the Commonwealth, in the sense that the Commonwealth had agreed to guarantee PRMSA's bond issues. The Commonwealth did not, however, agree to pay any judgments against PRMSA. The local law of Puerto Rico allowed PRMSA to sue or be sued, as well as hold property in its own name. The ability of PRMSA to contract was entirely separate from that of the Commonwealth. In short, under the law of Puerto Rico, PRMSA was an entity separate from the Commonwealth and therefore not entitled to share in its sovereign immunity.

This does not resolve the question, however, because in 1995, the Puerto Rico Legislature decided to do away with PRMSA by liquidating its assets and assigning Commonwealth funds to pay its future claims. We therefore must determine whether this act

---

[6]The factors to be used in the Third Circuit when assessing claims of sovereign immunity, although configured somewhat differently from those in the First Circuit in *Trans American*, would lead to an identical result nevertheless. They are:

(1) whether, in the event the plaintiff prevails, the payment of the judgment would come from the state, as subdivided into the following subfactors:

 (a) whether the payment will come from the state treasury;

 (b) whether the agency has sufficient funds to satisfy the judgment;

 (c) whether the sovereign has immunized itself from responsibility for the agency's debts;

(2) the status of the agency under state law, as subdivided into the following subfactors:

 (a) how state law treats the agency generally;

 (b) whether the agency is separately incorporated;

 (c) whether the agency can sue or be sued in its own right;

(d) whether the agency is immune from state taxation

(3) the degree of autonomy enjoyed by the agency.

*Christy v. Pennsylvania Turnpike Commission*, 54 F.3d 1140, 1144-45 (3d Cir. 1995).

applies retroactively to claims such as those of VIMS, which arose before the date of its passage in 1995. Only if the legislation does apply retroactively must the Court resolve whether it would provide PRMSA with immunity in this litigation.

## B. *Retroactive Legislation*

■ ■ There is a presumption against retroactive legislation which is deeply rooted in the jurisprudence of American courts and embodies a legal doctrine centuries older than our Republic.[7] Elementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly. Settled expectations should not be lightly disrupted.[8] For that reason, the principle "that the legal effect of conduct should ordinarily be assessed under the law that existed when the conduct took place has timeless and universal appeal." *Kaiser Aluminum & Chemical Corp. v. Bonjorno*, 494 U.S. 827, 855 (1990) (Scalia, J., concurring). "In a free, dynamic society, creativity in both commercial and artistic endeavors is fostered by a rule of law that gives people confidence about the legal consequences of their actions." *Lynce v. Mathis*, 117 S.Ct. 891, 895 (1997).

> The presumption against the retroactive application of new laws is an essential thread in the mantle of protection that the law affords the individual citizen, which finds expression in several provisions of the Constitution. "The Ex Post Facto Clause flatly prohibits retroactive application of penal legislation. Article I, § 10, cl. 1, prohibits States from passing another type of retroactive legislation,

---

[7] *See, Kaiser Aluminum & Chemical Corp. v. Bonjorno*, 494 U.S. 827, 842-844, 855-856 (1990) (Scalia, J., concurring). *See also, e.g., Dash v. Van Kleeck*, 7 Johns. 477, 503 (N.Y. 1811) ("It is a principle of the English common law, as ancient as the law itself, that a statute, even of its omnipotent parliament, is not to have a retrospective effect") (Kent, C.J.); Smead, *The Rule Against Retroactive Legislation: A Basic Principle of Jurisprudence*, 20 Minn.L.Rev. 775 (1936).

[8] *See General Motors Corp. v. Romein*, 503 U.S. 181, 191 (1992) ("Retroactive legislation presents problems of unfairness that are more serious than those posed by prospective legislation, because it can deprive citizens of legitimate expectations and upset settled transactions."); Munzer, *A Theory of Retroactive Legislation*, 61 Texas L.Rev. 425, 471 (1982) ("The rule of law . . . is a defeasible entitlement of persons to have their behavior governed by rules publicly fixed in advance."). *See also Landgraf v. USI Film Products*, 511 U.S. 244, 266 (1994); L. Fuller, The Morality of Law 51-62 (1964).

laws 'impairing the Obligation of Contracts.' The Fifth Amendment's Takings Clause prevents the Legislature (and other government actors) from depriving private persons of vested property rights except for a 'public use' and upon payment of 'just compensation.' The prohibitions on 'Bills of Attainder' in Art. I §§ 9-10, prohibit legislatures from singling out disfavored persons and meting out summary punishment for past conduct. The Due Process Clause also protects the interests in fair notice and repose that may be compromised by retroactive legislation.

*Landgraf v. USI Film Products*, 511 U.S. 244, 266 (1994)(footnote and citation omitted). *See also Lynce v. Mathis*, 117 S.Ct. 891, 895 (1997). In both the civil and the criminal context, the Constitution places limits on the sovereign's ability to use its law-making power to modify or undo bargains it has made with its subjects.

■ The general rule of law is that absent specific direction that a law is to be applied retroactively, laws should be applied prospectively only. This rule has been expressed in numerous opinions of the Supreme Court.[9] During more than 150 years of

---

[9] "Where it is claimed that a law is to have a retrospective operation, such must be clearly the intention, evidenced in the law and its purposes, or the court will presume that the lawmaking power is acting for the future only and not for the past." *White v. United States*, 191 U.S. 545, 552 (1903).

There are certain principles which have been adhered to with great strictness by the courts in relation to the construction of statutes as to whether they are or are not retroactive in their effect. The presumption is very strong that a statute was not meant to act retrospectively, and it ought never to receive such a construction if it is susceptible of any other. It ought not to receive such a construction unless the words used are so clear, strong and imperative that no other meaning can be annexed to them or unless the intention of the legislature cannot be otherwise satisfied.

*United States Fidelity & Guaranty Co. v. United States ex rel. Struthers Wells Co.*, 209 U.S. 306, 314 (1908).

"[A] retrospective operation will not be given to a statute which interferes with antecedent rights or by which human action is regulated, unless such be the unequivocal and inflexible import of the terms, and the manifest intention of the legislature." *Union Pacific R. Co. v. Laramie Stock Yards Co.*, 231 U.S. 190, 199 (1913). "The initial admonition is that laws are not to be considered as applying to cases which arose before their passage unless that intention be clearly declared. . . . If the absence of such determining declaration leaves to the statute a double sense, it is the command of the cases, that that which rejects retroactive application

doctrinal certainty, the Supreme Court did not always deny retroactive application to new statutory law. But when the Court has allowed retroactive effect, the statute has always expressly required it. *See, e.g., Watson v. Mercer,* 8 Pet. 88 (1834); *Graham & Foster v. Goodcell,* 282 U.S. 409 (1931). If the new law was silent on the issues, the Court has consistently applied the presumption of prospectivity. *See Smead,* 20 Minn.L.Rev., at 780-781, and n. 22. *See also Kaiser Aluminum & Chemical Corporation v. Bonjorno,* 494 U.S. 827, 843-844 (1990).[10]

## C. *The Effect of the 1995 Legislation Liquidating PRMSA*

In 1995, the Legislature of Puerto Rico enacted legislation designed to dissolve PRMSA as an entity, liquidate its assets, and allow the treasury of Puerto Rico to settle claims and debts during the dissolution of PRMSA. According to the terms of Article 4 of the Law Number 113 of March 3, 1995, the assignments provided by the law "will be in addition to . . . the operating expenses of the Authority and for the *payment of claims which may arise* as a consequence of the maritime transportation . . . ." (emphasis added). This provision stated that the law allowed the assignments from the Commonwealth's treasury to cover claims which would arise in the future. No mention was made that the assignments would cover claims which had already arisen. Inasmuch as the claims which are the subject of this case had already arisen, they therefore were not provided for specifically in this new legislation.

■ The Legislation of March 3, 1995 also provided for the sale of all assets of PRMSA, the proceeds of which were to be available to pay the expenses of the operations of the Authority. While this is not an explicit statement that money from the sale of its assets should be used to pay any then existing claims, it does not foreclose such an interpretation.[11] Since the act does not expressly

---

must be selected." *Shwab v. Doyle,* 258 U.S. 529, 534-535 (1922). "[A] statute cannot be construed to operate retrospectively unless the legislative intention to that effect unequivocally appears." *Miller v. United States,* 294 U.S. 435, 439 (1935).

[10] Perhaps the major exception to this rule against retroactive application has been in the area of remedial legislation, especially in the civil rights context. The legislation at issue in this case is clearly not remedial in nature.

[11] Since the act stated no such intention, and its terms appear prospective only in its effect, a reasonable interpretation is that the proceeds of the sale would be used to pay off then

make its provisions apply retroactively to pre-existing claims and its language indicates it should be applied prospectively, we held that the liquidation legislation of March 3, 1995 did not govern this case. Accordingly, PRMSA does not share in the sovereign immunity of the Commonwealth of Puerto Rico.

## IV. Rule 50-Judgment as a Matter of Law

In addition to the motion to dismiss based on jurisdictional grounds, PRMSA moved pursuant to RULE 50 of the FEDERAL RULES OF CIVIL PROCEDURE for judgment as a matter of law at the close of plaintiff's case, at the close of defendant's case, and post-trial. Having reserved decision until after the verdict, the Court will now rule on the motion.

### A. *The Standard*

When deciding a motion for directed verdict pursuant to RULE 50, the Court must "consider the evidence in the light most favorable to the non-moving party," and deny the motion "if there is evidence reasonably tending to support the recovery by the plaintiff as to any of its theories of liability." *Walmsley v. City of Philadelphia*, 872 F.2d 546, 551 (3d Cir.), *cert. denied*, 493 U.S. 955 (1989). A directed verdict should be granted only if "there is no question of material fact for the jury and any verdict other than the one directed would be erroneous under the governing law." *Macleary v. Hines*, 817 F.2d 1081, 1083 (3d Cir. 1987); *Bielevicz v. Dubinon*, 915 F. 2d 845, 849 (3d Cir. 1990). More specifically, where "the record is critically deficient of that minimum quantum of evidence from which a jury might reasonably afford relief", granting a motion for directed verdict is appropriate. *Wilkerson v. McCarthy*, 336 U.S. 53, 62 (1949); *Brady v. Southern R. Co.*, 320 U.S. 476, 479-480 (1943) (A trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion on the verdict.); *Williams v. Guzzardi*, 875 F.2d 46, 50 (3d Cir. 1989); *J. I. Hass Co. v. Gilbane Building Co.*, 881 F.2d 89, 91 (3d Cir. 1989).

---

existing claims, such as this claim which had been in existence since 1992. Accordingly, it is fair to presume that the Legislature intended that the funds for any existing claims against PRMSA would be provided not by the Legislature, but by the sale of PRMSA's assets.

The United States Supreme Court has made clear that judges are

> no longer required to submit a question to a jury merely because some evidence has been introduced by the party having the burden of proof, unless the evidence be of such character that it would warrant the jury in finding a verdict in favor of that party. Formerly it was held that if there was what is called a scintilla of evidence in support of a case the judge was bound to leave it to the jury, but recent decisions of high authority have established a more reasonable rule, that in every case, before the evidence is left to the jury, there is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed.

*Anderson v. Liberty Lobby*, 477 U.S. 242, 250-251 (1986).

B. *Interpreting the Agency Agreement*

In this case, out of an abundance of caution, the Court withheld its ruling and took PRMSA's motions for judgment as a matter of law on Count I under advisement, rather than issuing an immediate and hurried decision. PRMSA asserted that the contract was clear and unambiguous, and that as a matter of law, the Court should dismiss VIMS's complaint. Article 12, the relevant provision of the Agency Agreement between VIMS and PRMSA is recited in full on pages six and seven.

■ As already noted, the parties differ over the meaning of and the interplay between 12(A) and 12(B) of Article 12. First, VIMS claims that the contract is ambiguous, while PRMSA claims that the meaning of the contract is clear and unambiguous.[12] VIMS contends that the Agency Agreement allowed PRMSA to terminate

---

[12] The construction of an unambiguous contract is a matter of law for the court and therefore is subject to plenary review. It is well settled law that language in a contract is ambiguous and requires interpretation rather than construction, if it is susceptible of more than one meaning even when read in the context of the entire agreement. *Conkley Bay Condo. Ass'n v. Continental Ins. Co.*, 770 F. Supp. 1046 (D.C.V.I. 1991). Contract interpretation, as opposed to construction, involves mixed questions of law and fact. *U & W Indus. Supply, Inc. v. Martin Marietta Alumina*, 34 F.3d 180 (3d Cir. 1994).

only by a ninety-day notice on one of the grounds stated in 12(B), whether or not the ground justifying termination occurred during the initial three year period. PRMSA, on the other hand, reads Article 12(B) as restricting the reasons for which it could terminate the Agency Agreement during only the initial three year period. If the Agency Agreement continued after the initial three year period, PRMSA argues that it could be terminated simply by either side giving ninety days notice. The fact that the parties do not agree on the proper construction of Article 12 does not render the termination provision ambiguous. The Court must determine as a matter of law whether the provision is ambiguous. "Contracts are not rendered ambiguous by the mere fact that the parties do not agree on their proper construction." *Reed, Wible and Brown v. Mahogany Run Development Corp.*, 550 F.Supp. 1095, 1099 (D.C.V.I. 1982), *citing Par-Knit Mills v. Stockbridge Fabrics Co.*, 636 F.2d 51, 54 (3d Cir. 1980); *New Wrinkle. Inc. v. John L. Armitage & Co.*, 238 F.2d 753, 757 (3d Cir. 1956).

■ The Court finds that Article 12 of the Agency Agreement is unambiguous. Therefore the Court will construe its meaning as a matter of law. According to 12(A), the agreement "shall remain in force for three(3) years," and for an indefinite time thereafter, unless "notice of a party's intention to terminate this agreement at the end of such three year period be given by such party to the other at least ninety (90) days in advance of the end of such year . . . ." 12(A) provided that once it is continued past the initial three year term, "this Agreement shall continue in full force and effect thereafter until terminated by notice given by the party desiring to terminate this Agreement to the other at least ninety (90) days in advance of the specified termination date." Nowhere in 12(A) was there a requirement for either party to give a reason for termination once the Agreement had continued in effect past the initial three year period.

■ Since the method for terminating the Agency Agreement after the initial term is fully covered in 12(A), only the method for termination during the first three years is needed to be covered, and it is provided by 12(B). Thus, during the initial contract term, PRMSA was given the right in 12(B) to terminate VIMS only for

VIMS' gross negligence, unlawful or wrongful acts, or failure to obtain a reasonable market share for PRMSA. The provisions of 12(B) thus gave VIMS protection from arbitrary termination by PRMSA during the initial start-up term of the Agency Agreement. Since 12(A) covers any continuation period of the Agreement, 12(B) makes sense only as allowing PRMSA to terminate VIMS upon ninety days notice for the three specified grounds during the initial three year period. Any other construction of Article 12 would require the Court to rewrite the contract and would put the two subparts in direct conflict with each other. A construction of 12(B) as limiting PRMSA's ability to terminate after three years to one of the three grounds only would re-write 12(A), since 12(A) gives either party the right to terminate after three years by a ninety-day notice for any or no reason; reading 12(B) as modifying 12(A) would require the Court to write "VIMS" every time "party" is used in 12(A). Under the construction offered by VIMS, 12(A) thus would be rewritten to state that, after three years, VIMS may terminate on ninety days' notice for any reason, while PRMSA may only terminate for the reasons listed in 12(B). Such a construction would do clear violence to the unambiguous language of 12(A).[13]

Under VIMS's strained attempts at constructing Article 12, the Court would have to engage in substantial revisions of the contract. The only legally acceptable construction is that offered by PRMSA. Under 12(A), the Agency Agreement would exist for an initial three year period, at the end which, absent a ninety-day notice of termination from either party, the agreement would remain in effect until either party gave a ninety-day notice. During the initial three-year period, however, PRMSA could terminate the Agency Agreement for the specific reasons stated in 12(B). Each word of Article 21 is thus given its natural meaning without any need for interpretation, implication or importation. According to the four corners of the Agency Agreement, this is the clear and unambiguous meaning of the provisions for terminating the

[13] The only other was to construe 12(B)as limiting PRMSA's basis for terminating the Agency Agreement after the initial three-year period would be to restrict 12(A) as limiting VIMS to one of the same three grounds listed in 12(B). Such a construction would require the Court to rewrite the terms to a limitation on both which the parties expressly placed only on PRMSA. Moreover, the three specified grounds can only apply to PRMSA because they require some misfeasance or malfeasance on the part of VIMS.

209

contract as written by the parties. Accordingly, the Court finds that the Agency Agreement is unambiguous, and that PRMSA, or VIMS for that matter, was entitled to terminate it simply by giving ninety days notice under 12(A) since it had been in effect for more than three years. The Court will therefore enter judgment in favor of PRMSA on the sole remaining issue as a matter of law.

### V. Motion For New Trial

In its motion, PRMSA also asked that in the alternative to a judgment that it properly terminated the Agency Agreement, a new trial be granted under RULE 59 of the FEDERAL RULES OF CIVIL PROCEDURE. PRMSA appears to move for a new trial on two separate grounds. The first is that the verdict was not supported by evidence brought forth during trial. The second ground is based on improper remarks made in closing. The Court will briefly address each as alternative bases for vacating the jury's verdict.

### A. Verdict Unsupported by Evidence

■■■ There is no fixed standard for granting RULE 59 relief. Instead, the applicable standard varies with the grounds on which a new trial is sought. *Henry v. HOVIC*, 163 F.R.D. 237 (D.C.V.I. 1995). Where the movant seeks a new trial on the basis that the verdict is against the weight of the evidence, the Court's power to overturn the jury's award is severely circumscribed. A court must tread carefully when a RULE 59 motion is predicated on this ground since,

> to some extent at least, [the court must] substitute[] [its] judgment of the facts and the credibility of the witnesses for that of the jury. Such an action effects a denigration of the jury system and to the extent that new trials are granted the judge takes over, if he does not usurp, the prime function of the jury as the trier of facts.

*Lind v. Schenley Indus., Inc.*, 278 F.2d 79, 90 (3d Cir.), *cert. denied*, 364 U.S. 835 (1960). In *Lind*, the Third Circuit Court of Appeals held that a jury's verdict should be more closely scrutinized where the trial is long and complicated and deals with a subject matter not lying within the ordinary knowledge of jurors. But where the

subject matter of the trial is simple and easily comprehended by intelligent laymen, the verdict should be subjected to less demanding scrutiny. *Id.* at 90-91; *See also Henry* at 239. *Lind* undoubtedly clarified the judge's role in reviewing RULE 59 motions, but it did not eviscerate it. By recognizing that the jury's verdict — even in the simple, familiar case — requires some level of judicial scrutiny, *Lind* preserved the judge's essential function of preventing a miscarriage of justice.

■■■ While *Lind* defined the judge's role in reviewing Rule 59 motions, it did not specify the criteria to be used in evaluating the jury's verdict. Over time, the Court of Appeals has refined the standards promulgated in *Lind* and has articulated factors for a judge to consider in deciding whether to grant a new trial on the ground that the verdict is against the weight of the evidence. "New trials because the verdict is against the weight of the evidence are proper only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks our conscience." *Williamson v. Consolidated Rail Corp.*, 926 F.2d 1344, 1349 (3d Cir. 1991). Clearly, these factors are subjective and leave much to the discretion of the trial judge. But in an elaboration of this "shocked conscience" standard, the Third Circuit has imparted a test of reasonableness. Thus, for a judge to disturb a jury award on "weight of the evidence" grounds, the verdict must "be so unreasonable as to offend the conscience of the court." *Murray v. Fairbanks Morse*, 610 F.2d 149, 152 (3d Cir. 1979). The Court of Appeals has consistently recognized that where there is no rational basis in the record for the jury's award, the trial court may reduce or vacate the award as excessive.

Of course, whether or not the jury's verdict is rational can only be determined by weighing it against the evidence presented at trial. But how much supporting evidence need there be for the jury's verdict to withstand RULE 59 scrutiny? Put differently, at what point does the jury's verdict become unreasonable in light of the supporting evidence? Wright, Miller and Kane are unequivocal. "On a motion for a new trial . . . the judge may set aside the verdict even though there is substantial evidence to support it." 11 CHARLES A. WRIGHT, ARTHUR R. MILLER, & MARY K. KANE, FEDERAL

Practice And Procedure § 2806 (2d ed. 1995) (" Wright & Miller"). Many courts, including at least one in this Circuit, have taken this view.[14] Although the Court of Appeals for this Circuit has not addressed this specific issue, *Lind* still casts a large shadow. Although the quantum of evidence necessary to shield the jury's verdict from a successful Rule 59 attack is lesser for the simple case than for the complex suit, but the verdict must still be weighed.

■ *Lind* does not stand for the proposition that the trial court must abandon its scrutiny upon finding a mere scintilla of evidence to support the jury's verdict. Indeed, almost every case that reaches the jury has some evidentiary basis upon which the jury could find for either party, otherwise the court would enter judgment as a matter of law at the close of the evidence under Fed. R. Civ. P. 50. Even where the evidence is sufficient to send the case to the jury, it nevertheless may be inadequate to support the jury's verdict. A Rule 59 motion therefore requires a more discriminating review of the evidence. The trial judge must view the evidence as a whole, weighing the relative strengths and weaknesses of each party's case, bearing in mind the credibility of the witnesses, any conflicting testimony, and the forcefulness of the evidence. It is this holistic view of the case that makes the trial judge uniquely suited to decide whether the jury's verdict was reasonable or shockingly excessive.

■ PRMSA alleges that the jury's monetary award is not supported by the evidence. The mere fact that the trial judge believes the jury to be unduly generous would not be sufficient to warrant a new trial or remittitur. *Dunn v. HOVIC*, 1 F.3d 1362, 1367 (3d Cir. 1993). Rather, the judge must find that no rational jury, acting on the basis of the full evidentiary record, and without being inflamed by passion or prejudice or other improper consideration, could have awarded such a large sum as damages. *See Gumbs v. Pueblo*, 823 F.2d 768, 773 (3d Cir. 1987). The trial judge has discretionary authority to afford a victorious plaintiff the choice between accepting a reduced verdict, or granting a new trial. *Allied*

---

[14] *See, e.g., Lama v. Borras*, 16 F.3d 473, 477 (1st Cir. 1994); *Poynter by Poynter v. Ratcliff*, 874 F.2d 219 (4th Cir. 1989); *Bevevino v. Saydjari*, 574 F.2d 676, 683 (2d Cir. 1978); *Balaska v. National Tea Co.*, 328 F. Supp. 147, 148 (W.D. Pa. 1971).

*Chemical Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36 (1980); *Kazan v. Wolinski*, 721 F.2d 911, 914 (3d Cir. 1983). The Court of Appeals for the Third Circuit has consistently recognized that where there is no rational basis in the record for the jury's award, the trial court may reduce or vacate the award as excessive.[15]

■■■ No matter what standard is applied in this case, the verdict of the jury is utterly without support from the evidence adduced at trial. The Court allowed VIMS to put on evidence that it had made approximately $71,000.00 from the Agency Agreement the year before the agreement was terminated. VIMS was precluded from introducing any future economic projections because plaintiff had no expert through which to present, verify and explain such projections. Contrary to the Court's ruling, VIMS nevertheless argued to the jury that they should award damages for ten years of approximately $710,000.00 or ten times the $71,000.00, and this was the only evidence of damages produced during the trial. Even assuming the argument was proper, the jury's verdict of $2,911,297.00 is more than four times this figureand very similar to the figures mentioned by VIMS in opening statement of $871,000.00 for breach of contract and $1.9 million for the dismissed Count III of tortious interference. Obviously, the jury's verdict bears absolutely no relationship to the minimal, and speculative evidence of damages before the jury.

While it is within the Court's discretion to modify the amount of the judgment, this verdict is so far removed from the evidence that it goes beyond a windfall; it is a miscarriage of justice which shocks the conscience of the Court. Accordingly, the Court finds that a new trial would be warranted even if PRMSA were not entitled to judgment as a matter of law.

---

[15] *See, e.g., Russell v. Monongahela Ry.*, 262 F.2d 349 (3d Cir. 1958); *Walther v. Pueblo Supermarket of St. Thomas, Inc.*, 433 F.2d 935, 936 (3d Cir. 1970); *Edynak v. Atlantic Shipping, Inc.*, 562 F.2d 215, 225-26 (3d Cir. 1977), *cert. denied*, 434 U.S. 1034 (1978); *Murray v. Fairbanks Morse*, 610 F.2d 149, 153 (3d Cir. 1979); *David v. Pueblo Supermarket of St. Thomas, Inc.*, 740 F.2d 230 (3d Cir. 1984); *Gumbs v. Pueblo Int'l, Inc.*, 823 F.2d 768 (3d Cir. 1984); *Walters v. Mintec/International*, 758 F.2d 73, 80 (3d Cir. 1985); *Williams v. Martin Marietta Alumina, Inc.*, 817 F.2d 1030, 1041 (3d Cir. 1987); *Keenan v. Philadelphia*, 983 F.2d 459, 472 (3d Cir. 1992).

## B. Improper Closing Remarks

PRMSA also asks for a new trial on the ground that Attorney Ashley Andrews, one of the counsel for VIMS, stated in his rebuttal closing that VIMS was terminated by PRMSA in an intentional effort to destroy the company after VIMS had spent millions of dollars in reliance on its agency relationship with PRMSA. Attorney Andrews further spoke of employees of VIMS who had lost their jobs, and the unproved corporate profits which the jury could project over twenty or thirty years. These inflammatory and grossly improper statements were made without any support whatsoever in the evidence before the jury.

After the jury had been excused to deliberate, counsel for PRMSA asked for a mistrial as a result of Attorney Andrews' statements. The Court denied this request, informing defense counsel that had a timely objection been made, the Court would have considered giving a curative instruction.[16] The Court indicated that these improper statements made by VIMS' counsel did not appear to be so clearly likely to affect the jury as to warrant a mistrial.

 The Court has already concluded that a new trial would be warranted since the amount of the jury's verdict was not even remotely related to the evidence at trial. While the misstatements of Attorney Andrews did not appear sufficiently likely to affect the jury's deliberations or to warrant a mistrial at the time, it is clear now that they must have contributed to the jury's outrageous verdict. The Court certainly cannot conclude that counsel's improper statements had no effect on the jury. Stretching plaintiff's meager evidence on damages to its limit, a verdict of at most $710,000.00 might be supported.[17] A jury verdict which exceeds four times that amount conclusively demonstrates that something drastically improper occurred during the jury's deliberations.

---

[16] The Court had already given the jury a standard instruction that opening statements and closing arguments are not evidence, and that it is the jury's role to decide the facts of the case from the evidence testified to by witnesses and admitted into evidence by the Court.

[17] Defendant asserts that even if plaintiff's figures were accepted, the fact that the plaintiff suffered operational losses in fiscal years 1986, 1987, 1988, 1991 and 1992 (but enjoyed net operational profits in 1989 and 1990) would preclude a finding that plaintiff otherwise would have profited from this contract. Since the jury's verdict is utterly unsupported by the evidence, the Court need not delve this deeply.

Given the enormous discrepancy between the evidence and the verdict amount, counsel's improper statements would be sufficient to warrant a new trial, assuming PRMSA were not entitled to judgment in its favor on the issue of breach of contract.

## VI. Conclusion

PRMSA has sought post-trial relief from the jury's verdict against it in the amount of over $2.9 million. The Court first articulates why PRMSA is not entitled to the sovereign immunity it sought. PRMSA could not share the sovereign immunity of the Commonwealth of Puerto Rico during the life of the Agency Agreement with VIMS because the treasury of Puerto Rico would not be tapped to pay claims against PRMSA. Moreover, the later law which liquidated PRMSA and committed the Commonwealth to pay its future obligations did not express a clear intent that the new law would apply retroactively to pre-existing claims against PRMSA, such as those of VIMS. Absent such an intent, the law is prospective in application and does not afford PRMSA the protection of sovereign immunity in this case.

The Court holds, however, that PRMSA is entitled to judgment as a matter of law on VIMS breach of contract claim. The contract between VIMS and PRMSA was clear and unambiguous and the Court has construed its terms as a matter of law. After the initial three year period, either party could terminate the Agency Agreement with ninety days' notice. PRMSA legally terminated the Agency Agreement. Accordingly, the jury's verdict will be set aside, and the plaintiff's complaint is dismissed with prejudice.

As alternative grounds of decision, the Court also rules that PRMSA's motion for a new trial based on RULE 59 was well founded. The Court would hold that the amount of the jury's verdict bears no rational relationship to the evidence presented by VIMS, and therefore shocks the judicial conscience. This, together with the improper argument of VIMS' counsel to the jury, would justify ordering a new trial, even if PRMSA were not entitled to judgment as a matter of law. A separate order follows.

ENTERED this 20th day of June, 1997.

215

**ORDER**

For the reasons set forth in the accompanying Memorandum, it is hereby

ORDERED that defendant's motion for judgment as a matter of law is GRANTED. It is further

ORDERED that the jury's verdict returned on February 21, 1997 is VACATED and PLAINTIFF'S COMPLAINT IS DISMISSED WITH PREJUDICE.

ENTERED this 20th day of June, 1997.